**FEDERAL TRADE COMMISSION,**
Plaintiff–Appellee,

v.

**AMY TRAVEL SERVICE, INC., Resort Performance, Inc., Resort Telemarketing, Inc., Thomas P. McCann, II, and James F. Weiland, Defendants–Appellants.**

No. 88–1997.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1988.

Decided April 19, 1989.

Opinion on Dismissal of Appeal
May 5, 1989.

Melvin H. Orlans, Office of Gen. Counsel, Washington, D.C., for plaintiff-appellee.

Ben Broocks, Bennett & Broocks, H. Victor Thomas, Houston, Tex., for defendants-appellants.

Before CUMMINGS, WOOD, Jr., and CUDAHY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The defendants in this case are three corporations and two individuals. The corporations are Amy Travel Service, Inc. ("Amy"), Resort Telemarketing, Inc. ("RTI"), and Resort Performance, Inc. ("RPI"). The individuals, Thomas P. McCann II ("McCann") and James F. Weiland ("Weiland"), were the owners and directors of the defendant corporations. These companies market discount vacations through the sale of "vacation certificates" or "vacation passports." The Federal Trade Commission ("FTC") filed suit to enjoin defendants' allegedly deceptive trade practices. The FTC also asked for rescission of contracts and restitution to consumers. The case was tried by consent to a magistrate, who found for the FTC. The magistrate entered a permanent injunction, ordered restitution, and imposed personal liability on the individual defendants. Defendants filed this appeal, questioning the power of the court to order such remedies and alleging other errors below.

## I. FACTUAL BACKGROUND

This is an appeal from a final judgment and this court has jurisdiction under 28 U.S.C. § 1291. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345 and 15 U.S.C. § 53(b). We will detail the findings of fact made by the district court to present the necessary backdrop for this appeal.

### A. "This is not a sales call, so please relax ..."

The defendant corporations and defendants Weiland and McCann were in the business of selling travel certificates (also known as "vacation passports" or "vacation vouchers"). In 1985, Weiland and McCann incorporated RPI as an Illinois corporation to market travel certificates. In 1986, McCann, Weiland, and two others opened a "telemarketing" sales room in Indianapolis, Indiana to sell "vacation passports" over the telephone. This business operated under the name of RTI, an Indiana corporation. As their business increased, McCann and Weiland opened eight other phone sales rooms in Texas, Illinois, Colorado, and Kentucky.[1] All of the businesses were wholly-owned subsidiaries of RTI. McCann and Weiland managed all the businesses and they were all operated as a single entity. Defendant Amy was purchased in 1985 to fulfill vacation certificate travel obligations.

The defendants used telemarketing to sell vacation packages. The service provided was similar to that performed by a conventional travel agent—the assembly of a vacation package that included air transportation and lodging at a resort area—but the method used to sell the packages was quite different than the norm in the travel industry. Defendants assembled written materials that they called a "vacation passport" and sold the passports to consumers for $289 to $329. The passport consisted of two pages of written material and it contained written descriptions of the vacation package being offered. The passport listed nine resort destinations and identified RPI and Amy as the presenters of the offer. The passport stated:

---

1. The Texas operations were incorporated as Resort Telemarketing of Texas, Inc. ("RTI Texas") and Texas Communications 7 Travel, Inc. ("TCT"). The Illinois phone rooms were incorporated as American Consumers Marketing, Inc. ("ACMI") and National Consumers Marketing, Inc. The Colorado rooms were incorporated as Resort Telemarketing of Colorado, Inc., National Travel Brokers, and Travel Excellence, Inc. The Kentucky room operated as Consumers Power, Inc.

This Passport entitles the adult holder(s) to receive *two round-trip air tickets plus lodging* for 8 days and 7 nights for the price not to exceed one unrestricted round-trip, standard, all-year, full-economy (Y-class) airfare. Single adult travelers are entitled to the identical benefits for 50 per cent of the unrestricted Y-class fare.

The passport also detailed reservation procedures, including a requirement that all travel arrangements be made through Amy. On the back side of the passport, under the caption "Amy Travel Service Inc.," there was a form allowing the purchaser of the passport to select three alternate destinations and departure dates. Finally, the passport included a statement that Amy "guarantees the lowest price of your itinerary or will pay you triple the difference in cash."

To facilitate sales of the passports over the phone, McCann and Weiland developed a "script" to be used by the telephone salespeople. The basic script [2] includes language intimating that the offer was being made to only a few special customers. The customer must "qualify" for the offer by answering yes to a few simple questions. While the price of the voucher varied from $289 to $329, the price of the airfare that the prospective traveler also needed to purchase was never given. Customers were only told that the cost of the voucher entitled them to a fully paid vacation for eight days and seven nights plus two round trip airfares for a cost not to exceed one "unrestricted round trip (Y-class) full economy airfare." Customers were asked to provide

**2.** Plaintiff's Exhibit 7 is an example of the scripts developed by the defendants. Defendants admit that this is one of their scripts.

*TEXAS COMMUNICATIONS & TRAVEL, INC.*
HI, MY NAME IS _____ WITH T.C. & T. OF HOUSTON, TEXAS. HOW ARE YOU TODAY? GREAT!!!! MR./MRS./MS. _____, THE REASON I AM CALLING, IS YOU HAVE BEEN *COMPUTER SELECTED* TO BE OFFERED A *SPECIAL,* VACATION VOUCHER TO *HAWAII FOR ONLY $329.90!* THIS IS BEING OFFERED TO *LESS* THAN 1% OF *ALL* THE CREDIT CARD HOLDERS IN THE U.S.
AT THAT PRICE, I'M SURE YOU'D LIKE TO GO, HOWEVER, I DO HAVE TO ASK SOME QUALIFYING ?S FIRST. PROBABLE QUESTIONS: (1) WHY SO CHEAP? (2) WHAT'S THE CATCH? (3) WHAT DO I DO TO QUALIFY?
(REGARDLESS OF QUESTIONS, THE ANSWER IS:)
FIRST, MR./MRS./MS. _____, LET'S SEE IF *YOU QUALIFY.*
 1. YOU ARE 21 OR OVER, AREN'T YOU?
 2. YOU ARE STILL A MASTERCARD OR VISA CARD HOLDER, AREN'T YOU?
 3. YOU DO PLAN TO TAKE A VACATION WITHIN THE NEXT *12 MONTHS,* DON'T YOU?
 4. WHEN YOU TAKE YOUR VACATION, IF THE ACCOMMODATIONS WERE COMPLETELY PAID FOR, WOULD YOU TAKE SOMEONE WITH YOU?
 5. *AFTER* YOU HAVE ENJOYED YOUR VACATION, WOULD YOU SEND US THE NAMES OF 3 FRIENDS WHO WOULD LIKE TO TAKE A *SIMILAR VACATION,* IF THEY WERE UNDER NO OBLIGATION?
I'M GLAD YOU SAID (YES) TO THOSE QUALIFICATIONS.... NOW I CAN TELL YOU WHAT WE CAN DO FOR YOU, AND WHY WE CAN OFFER YOU THIS *WONDERFUL VACATION PACKAGE AT SUCH A LOW PRICE*!
WE *HAVE TESTED* THE FEASIBILITY OF TELEPHONE MARKETING, AND THE RESULTS HAVE BEEN SO GREAT THAT WE HAVE BEEN ALLOWED TO *CONTINUE* TO OFFER THIS SPECIAL VACATION PACKAGE TO *PREFERRED PEOPLE LIKE YOU.*
MR./MRS./MS. _____, FOR ONLY $329.90, *YOU WILL* RECEIVE YOUR VACATION VOUCHER, WHICH ENTITLES *YOU* TO A FULLY PAID VACATION FOR 8 DAYS AND 7 NIGHTS FOR (2) PEOPLE AT A BEAUTIFUL RESORT HOTEL, PLUS 2 ROUND TRIP AIRFARES, FOR A COST NOT TO EXCEED *(1) UNRESTRICTED ECONOMY AIRFARE.*
BY USING YOUR *MASTERCARD* OR *VISA,* YOU WILL RECEIVE YOUR VACATION VOUCHER WITHIN 7 TO 10 DAYS, OR SOONER.
*AS A PREFERRED CUSTOMER* ... WOULD YOU RATHER USE MASTERCARD OR VISA ...
 (*SHUT UP*!!!!!!!!!!!!!!!)
(WHEN YOU HAVE INTEREST, READ THIS RECAP) WHAT YOU ARE PURCHASING TODAY WITH YOUR CREDIT CARD IS A VACATION PASSPORT FOR $329.90. THIS PASSPORT ENTITLES YOU TO 2 ROUND TRIP AIR TICKETS, PLUS LODGING FOR 8 DAYS AND 7 NIGHTS FOR 2 PEOPLE AT A RESORT HOTEL, FOR A COST NOT TO EXCEED 1 UNRESTRICTED ROUND TRIP, (Y–CLASS) FULL ECONOMY AIRFARE.
*CLOSING:* WHAT IS THE EXPIRATION DATE? HOW DOES THAT # READ? OK, WHILE I'M GETTING YOUR AUTHORIZATION #, I WOULD LIKE TO HAVE MY MANAGER VERIFY EVERYTHING I HAVE SAID TO YOU.
*9714 OLD KATY ROAD, SUITE 212, HOUSTON, TEXAS 77055 12/8/86*

their Mastercard or Visa numbers. After the script was read, the salesperson gave the phone to a supervisor who then read a document known as the "Purchaser's Acknowledgement Agreement" over the phone to the customer. This "agreement" purported to explain the details of the purchase and included a statement that

> with your credit card purchase ... for the vacation passport voucher, you are entitled to receive a fully-paid vacation for two at a cost not to exceed that of one round-trip standard, all-year, full economy ("Y" class) airfare, which you agree to purchase from the travel agency named in the voucher.[3]

A copy of this agreement was sent to the customer along with the vacation voucher.

The magistrate found that the procedure we have described was not always followed to the letter. The magistrate examined other exhibits provided by the FTC that showed how the defendants and their sales staff had departed from the standard script. Plaintiff's Exhibit 2, for example, begins:

> Hi! My name is _____, I'm calling you with T.C. & T., I'm calling from Texas. This is *not* a sales call so please relax. The reason I am calling Mr./Mrs./Ms. _____, is this, you have been computer

selected thru a major credit card company to be offered a *fully paid vacation* to *Hawaii,* for only *$289.90....* We are testing the feasibility of telephone marketing for an INTERNATIONAL TRAVEL AGENCY. While we are doing this pilot program, they have given us a *VERY* LIMITED AMOUNT OF these *SPECIAL* priced vacations to offer.

Defendants conceded that there was no limit on the number of vouchers available. The magistrate noted that while McCann claimed he ordered the "this is not a sales call" line dropped, McCann had said in a deposition that he saw nothing wrong with the line. Salespersons were given canned responses to recurring customer questions. For example, salespersons were directed to respond to customer reluctance about giving out credit card numbers over the phone by stating that "... we contact MC/VISA to varify [sic] your credit.... If we misused any credit card number, not only would we lose that merchant number but no doubt, our bank would freeze our account for a complete audit of all business on MC/VISA." Some scripts also failed to make clear that the customer, by giving the salesperson a credit card number, would be charged for the voucher.

---

**3.** The wording of the Purchaser's Acknowledgment Agreement varied, but Plaintiff's Exhibit 7–2 provides an example:

PURCHASER'S ACKNOWLEDGEMENT AGREEMENT

1. With your credit card purchase of $329.90 for the vacation passport voucher, you are entitled to receive a fully-paid vacation for two at a cost not to exceed that of one round-trip standard, all-year, full economy ("Y" class) airfare, which you agree to purchase from the travel agency named in the voucher. In other words, for the cost of one airfare, the travel agency will provide both airline tickets and 8 days and 7 nights for two people, plus they do all the work. You have eight locations to choose from. They are ... ACAPULCO, JAMAICA, FLORIDA, BAHAMAS, HAWAII, LAS VEGAS, COLORADO, or LONDON.

2. The travel agency's guarantee to you is: They guarantee you the lowest cost of your vacation itinerary, including both airfares and lodging for two people or they will pay you triple the difference in cash if you can find the same lodging as we offer and the same airfares for a lesser amount.

3. Your vacation passport is non-cancellable nor redeemable for cash. However, it may be transferred to another adult of your choice at no penalty. They must understand, however, that in order to take advantage of the program they must pay the equivalent, not to exceed, one round trip, standard, all year, full economy (Y-class) airfare.

4. Your vacation passport will be processed and mailed to you within the next few days. The travel agency will need to receive your completed travel request form at least 45 days in advance of your requested departure date. The voucher is good through _____ 19____.

5. Your point of departure will be from any major airport serving all major cities in the continental United States.

6. You have agreed to furnish Texas Communication & Travel, Inc. with the names of three referrals either before or after you have taken your vacation. Your referrals are under no obligation to purchase.

7. Do you fully understand everything I have just read to you?????

DATE: _____ REP: _____
MANAGER: _____

**B. "At that price, I'm sure you'd like to go...."**

The defendants were quite successful at marketing their vacation vouchers. Defendants claim that approximately 35,000 certificates were sold wholesale to other companies and 25,000 were sold directly to consumers. Twelve thousand to 13,000 trips were taken by 25,000 people and some 17,000 customers were waiting for trips when the operation was shut down by the FTC. Gross revenues were around $1.5 million in 1986 and $4.5 million in 1987.

Consumer complaints about the defendants resulted from a number of the defendants' practices. Many consumers complained that the defendants misused their credit card numbers. A number of witnesses testified that when contacted by the salesperson, they were not told that they would be charged for a purchase—the witnesses claim the salesperson asked for a credit card number for the sole purpose of verifying the customer's credit worthiness.

Defendants ran into other troubles with banks handling defendants' credit card transactions. The difficulties arose because of the high number of consumers who disputed the charges made to their accounts by the defendants. These disputes resulted in chargebacks to the defendants' accounts when consumers refused to pay. The magistrate took note of one bank that eventually suffered over $700,000 in consumer chargebacks. A number of banks terminated defendants' accounts due to consumer complaints.

The main consumer complaint about the defendants' pitch was a misunderstanding about the true cost of the vacation package. The vacation passport itself was sold for $289 to $329. Printed on the passport was an explanation of the passport's worth —the bearer was entitled to two round trip airplane tickets and lodging for eight days and seven nights for a price "not to exceed one unrestricted round-trip, standard, all-year, full-economy (Y-class) airfare." Defendants could therefore charge consumers any amount up to the cost of a Y-class airfare in addition to the cost of the passport itself. The magistrate determined

that "the use of the word 'economy' suggested a low cost fare." *FTC v. Amy Travel*, No. 87 C 6776, slip op. at 27 (N.D. Ill. Feb. 10, 1987). The Y-class airfare, although described as a "full-economy" fare, is actually the highest-priced coach fare available. This was never disclosed to the purchasers of the vacation passports and the magistrate found this was deceptive. Only after a prospective traveler had booked a vacation was the true price disclosed.

The magistrate also found that the wording of the telemarketing scripts created the misleading impression that the cost of the vacation passport equaled the price of the entire vacation package. The magistrate noted that

> the script opened with the strong implication that the price was "only $329.90," reinforced by the false statement that the person was one of a select group of preferred credit card holders and the remark, "At that price, I'm sure you'd like to go ..."

*FTC v. Amy Travel*, No. 87 C 6776, slip op. at 26 (N.D.Ill. Feb. 10, 1987).

Finally, the magistrate determined that, upon hearing the script promise that for the stated price, the consumer would receive a voucher entitling purchaser to a vacation package "for a cost not to exceed (1) unrestricted economy airfare," a reasonable consumer listening over the phone would likely believe that the cost of the vacation passport was equivalent to one unrestricted economy airfare. *Id.*

The actual prices of the vacation packages far exceeded the cost of the vacation passport itself, and unrebutted evidence showed that the prices charged by Amy were not bargains. In her findings of fact, the magistrate took note of an example presented by the FTC of a vacation trip from Washington, D.C. to Honolulu. According to the affidavit, on April 28, 1987 the round trip Y-class airfare from Washington to Honolulu was $1,936 while a full vacation package for two to Waikiki including accommodations for seven nights and airfare was available from another travel agent for $1,198. The magistrate found

that, in light of such facts, the vacation passport was of little actual value; since the sales pitch had created the impression that the vacation passport was a great bargain, the magistrate determined that it was deceptive. The magistrate also found that Weiland and McCann were personally responsible for the management of the operations.

## C. The Proceedings Below

In response to numerous consumer complaints about the defendants' operations, the attorneys general of a number of states, as well as the FTC, acted against the defendants.[4] On August 3, 1987 the FTC filed its complaint, pursuant to section 13(b) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 53(b), claiming the defendants violated section 5 of the FTCA, 15 U.S.C. § 45. The FTC sought preliminary and permanent injunctive relief, an asset freeze, rescission, restitution, and other equitable relief. In its complaint, the FTC alleged that the defendants had engaged in unfair and deceptive marketing practices by misrepresenting and deceptively failing to disclose the true cost of the vacations they sold and misrepresenting their billing practices, including billing customers without authorization.

A temporary restraining order ("TRO") and an order to show cause why a preliminary injunction should not issue were also entered on August 3. The temporary restraining order froze defendants' assets, except as necessary to pay off obligations to customers, and required that defendants (1) cease any practices alleged to be deceptive and (2) account for all sales, cancellations, refunds, and vacations having to do with vacation passports. The order was later modified to allow for the payment of reasonable living expenses and reasonable attorneys' fees.[5]

After a number of delays and difficulties that eventually resulted in Rule 11 sanctions being levied against defendants' counsel,[6] trial was held before the magistrate between December 10 and December 16, 1987. The FTC presented several consumers, employees, and an expert as witnesses. Defendants objected to the exclusion of some evidence they attempted to present, including postcards sent to Amy by customers during their trips. The magistrate found that, since the FTC had already stipulated that some customers had taken trips, there was no need for further evidence proving this fact. The magistrate also excluded as irrelevant a witness who had purchased a vacation passport from someone other than the defendants and another witness who had received a passport as a premium for attending a sales presentation.

The magistrate concluded that the defendants had committed deceptive acts in commerce, made representations and omissions, acted in a manner likely to mislead, and actually misled reasonable consumers. The magistrate also found that the misrepresentations, practices, and omissions of defendants were material to the transaction. The magistrate entered a final order of permanent injunction on May 4, 1988, finding that the FTC had established a violation of the FTCA. The defendants, jointly and severally, were ordered to pay $6,629,100 to the FTC in redress. Enforcement of that order was stayed pending this appeal.

## II. DISCUSSION

Defendants dispute a number of decisions made by the trial court. Defendants initially contend that the court exceeded its powers when it imposed penalties on the defendants. Defendants also argue that the court unjustly held McCann and Wei-

---

4. Judgment decrees were entered against the defendants in Texas, Indiana, Illinois, and Kentucky.

5. The orders for attorneys' fees were entered under seal. The amount of fees paid is between $50,000 and $70,000, though the actual amount will not be specified.

6. Counsel for defense was sanctioned by the trial court under Fed.R.Civ.P. 11 and this sanction has also been appealed, *FTC v. Amy Travel*, No. 88–2328. That appeal was consolidated with this one for oral argument, but it will be addressed separately by this court.

land individually liable. Defendants contend that the magistrate's exclusion of certain testimony, the admission of some depositions, and the asset freeze were errors, and defendants also claim the magistrate exhibited bias and prejudice in dealing with this case.

## A. Equitable Powers Under Section 13(b)

Section 13(b) of the FTCA, 15 U.S.C. § 53(b), provides "[t]hat in proper cases the Commission may seek and after proper proof, the court may issue, a permanent injunction." Section 13(b) is often used by the FTC to pursue violations of section 5 of the FTCA or other violations of statutes. Defendants assert that the district court has no authority to grant monetary equitable relief, such as rescission and restitution, in a section 13(b) permanent injunction action.

In making this claim, defendants point to the language of the statute itself and argue that since the statute only specifies that the court shall have authority to grant a permanent injunction, the court's authority goes no farther than that. The magistrate, in determining that she had authority to use ancillary equitable relief such as rescission and restitution, relied on the Ninth Circuit case of *FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir.1982). In *Singer*, the Ninth Circuit found that because section 13(b) gives a court authority to grant a permanent injunction, the statute by implication gives authority "to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference." *Singer*, 668 F.2d at 1113. Defendants argue that *Singer* should not be adopted by this court, claiming that the clear language of the statute should point the way to refusing to give the district court ancillary equitable powers.

■ Defendants' efforts to curtail the power of the district court in this case have been thwarted by some recent decisions of this court that make clear the breadth of the equitable authority granted by section 13(b). In *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir.1988), this court adopted the Ninth Circuit's position in *Singer* that the granting of permanent injunctive power "also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference." *World Travel*, 861 F.2d at 1026 (quoting *Singer*, 668 F.2d at 1113). In *World Travel*, this court held that the district court had the authority under section 13(b) to grant interlocutory relief as well as permanent injunctive relief. *Id.* In *FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir.1989), this court specifically found that a district court could order rescission in a section 13(b) proceeding. In *Elders*, we dealt with whether the section 13(b) grant of preliminary injunctive authority carried with it a grant of other equitable powers. We found that such a granting of power "carries with it the power to issue whatever ancillary equitable relief is necessary to the effective exercise of the granted power." *Id.* at 907.

This reasoning applies with equal force to the issue of whether the granting of permanent injunctive powers also carries with it the power to invoke ancillary equitable relief. Rescission and restitution are proper forms of ancillary relief. All other circuits that have dealt with this issue have found that section 13(b) grants the authority to issue other necessary equitable relief. *See, e.g., FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir.1984) (district court has full equitable powers incident to express authority to issue permanent injunction under section 13); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir.1982) (permanent injunctive power also gives authority for ancillary equitable relief); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir.), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982) (grant of jurisdiction in section 13(b) includes authorization for district court to exercise full range of equitable remedies traditionally available). Defendants' reliance on this court's opinion in *JS & A Group, Inc.*, 716 F.2d 451 (7th Cir.1983), is misplaced. *JS & A*

*Group* did not address the question of whether the provision allowing the district court to enter a permanent injunction also permitted ancillary equitable relief—that case only dealt with whether the FTC must begin cease-and-desist proceedings prior to obtaining a section 13(b) permanent injunction. *World Travel,* 861 F.2d at 1026. We hold that in a proceeding under section 13(b), the statutory grant of authority to the district court to issue permanent injunctions includes the power to order any ancillary equitable relief necessary to effectuate the exercise of the granted powers.

## B. Exclusion of Evidence

Defendants next claim that the magistrate erred in excluding certain evidence during the trial for lack of relevancy and other reasons. The trial court excluded some testimony by "satisfied customers" of Amy, excluded certain expert witness testimony, and excluded testimony concerning advice given by counsel to defendants concerning their operation. The trial court has substantial discretion in making these types of evidentiary rulings and we must give the magistrate great deference. This court will not overturn these evidentiary decisions in the absence of a clear abuse of discretion. *Charles v. Daley,* 749 F.2d 452, 463 (7th Cir.1984), *appeal dismissed sub nom. Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986).

■ Defendants first contend that they should have been allowed to present testimony from customers satisfied with their vacations. The trial court excluded the testimony of two witnesses who took vacations arranged by Amy. The court found that the sales presentations given to the two witnesses were not made by any of the defendants, but were attributable to independent third parties. The magistrate reasonably concluded that the use of Amy to arrange the trips did not make the testimony relevant since the complaints at issue in this case concerned the representations and omissions made by the defendants in connection with the sale of the vacation packages. Performance of the travel obligations or any failure to perform was not at issue and the trial court did not abuse its discretion in excluding the testimony.

■ Similar reasoning was used by the magistrate to exclude postcards and letters sent to Amy by customers while on their vacations. Defendants argue that unsolicited postcards from satisfied customers show that customers were not deceived. Defendants misunderstand the proof that must be offered by the FTC. Contrary to defendants' claims, the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense under the FTCA. *Basic Books, Inc. v. FTC,* 276 F.2d 718, 721 (7th Cir.1960); *Erickson v. FTC,* 272 F.2d 318, 322 (7th Cir.), *cert. denied,* 362 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769 (1960). The magistrate correctly acknowledged the existence of satisfied customers in computing the amount of defendants' liability—customers who actually took vacation trips were excluded when the magistrate computed the amount of restitution awarded.[7] However, the existence of those customers is not relevant to determining whether consumers were deceived and the magistrate was correct to exclude the postcards and letters.

■ Defendants also criticized the trial court's exclusion of certain expert testimony. The trial court "has wide discretion in its determination to admit and exclude evidence, and this is particularly true in the case of expert testimony." *Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974); *see also Spesco v. General Elec. Co.,* 719 F.2d 233, 238 (7th Cir.1983); *Grindstaff v. Coleman,* 681 F.2d 740, 743 (11th Cir.1982). Steve Frenzl was offered by defendants as an

---

**7.** It was unclear how many customers who actually took trips were dissatisfied with their vacations. The difficulties involved in determining how much relief should be given to dissatisfied customers prompted the magistrate to limit the relief to those customers who received nothing of value for the price of the vacation passport. Customers, satisfied or unsatisfied, who took trips were excluded from the computation of relief and that decision is not at issue on this appeal.

expert in travel marketing. During Frenzl's testimony, defense counsel asked whether defendants' sales practices were "deceptive or misleading." The magistrate properly prevented Frenzl from answering since the question called for Frenzl to render a legal opinion. Mr. Frenzl was also prevented from commenting on consumer perception of the sales pitch. The magistrate determined that Frenzl did not possess the necessary expertise to give his opinion on this issue. *See* Fed.R.Evid. 104(a), 702. The court found that testimony on how consumers would react to sales material should be given by an expert in consumer psychology or consumer behavior. The magistrate did not abuse her discretion in making this determination. The magistrate also correctly excluded testimony from a travel law expert on other advertising methods used by travel companies and refused to allow one of defendants' employees to give his opinion on whether the defendants' methods were deceptive or unfair. The issue of the magistrate's exclusion of certain evidence relating to advice of counsel is premised on the individual liability of the defendants and will be dealt with separately.

## C. Individual Liability

Defendants now challenge the decision of the magistrate to hold all of them jointly and severally liable for restitution to consumers. Defendants claim that the FTC failed to meet its burden for imposing individual liability on defendants McCann and Weiland. Defendants also argue that the magistrate did not apply the correct legal standard for determining individual liability under the FTCA.

■ An individual may be held liable under the FTCA for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. *FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282 (D.Minn.1985). Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or

had authority to control them. *Kitco*, 612 F.Supp. at 1292; *FTC v. H.N. Singer, Inc.*, 1982–83 Trade Cas. (CCH) ¶ 65,011 at 70,-618–19, 1982 WL 1907 (N.D.Cal.1982). Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. *Kitco*, 612 F.Supp. at 1292; *see e.g., Consumer Sales Corp. v. FTC*, 198 F.2d 404, 408 (2d Cir.1952), *cert. denied*, 344 U.S. 912, 73 S.Ct. 335, 97 L.Ed. 703 (1953). The FTC must then demonstrate that the individual had some knowledge of the practices. The knowledge requirement is the key issue in this case.

While acknowledging that intent per se is not a necessary element in an FTC violation, *see United States v. Johnson*, 541 F.2d 710, 712 (8th Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed.2d 539 (1977) (When unfair trade practices occur, "liability for civil penalties arises without a need for any showing that the practices were intentional or malicious."); *Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294, 308–09 (7th Cir.1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir.1963), the defendants are asking this court to apply a higher standard of knowledge in cases where individuals could be held liable for monetary restitution. Defendants correctly point out that the cases cited for the proposition that intent to deceive is not a necessary element of an FTC violation all dealt with cease-and-desist orders or injunctions. In such cases, corporations and individuals are being directed to refrain from certain conduct. This case involves holding an individual liable for monetary restitution and defendants argue that it would be better to find bad faith before imposing such a sanction. *See Porter & Dietsch*, 605 F.2d at 309 (extent of party's culpability should affect nature of relief granted). Some district courts in other circuits have held that to find an individual liable for restitution under section 13(b), the FTC must prove that the defendant knew or should have known that the conduct was dishonest or fraudulent. *See FTC v. International Diamond Corp.,*

1983–2 Trade Cas. (CCH) ¶ 65,725 at 69,-706–07, 1983 WL 1911 (N.D.Cal.1983) (to hold defendant liable for redress under section 13(b), defendant's activity must rise to the level of fraud or dishonesty); *FTC v. Kitco of Nevada, Inc.,* 612 F.Supp. 1282, 1292 (D.Minn.1985) (to obtain monetary equivalent of rescission, FTC must prove defendant had knowledge that corporation or its agents "engaged in dishonest or fraudulent conduct"); *FTC v. Atlantex Assoc.,* 1987–2 Trade Cas. (CCH) ¶ 67,788 at 59,255, 1987 WL 20384 (S.D.Fla.1987).

■ We find that imposing a requirement that the FTC prove subjective intent to defraud on the part of the defendants would be inconsistent with the policies behind the FTCA and place too great a burden on the FTC. The FTC is required to establish the defendants had or should have had knowledge or awareness of the misrepresentations, *Kitco,* 612 F.Supp. at 1292, but that knowledge requirement may be fulfilled by showing that the individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Kitco,* 612 F.Supp. at 1292; *see also International Diamond,* 1983–2 Trade Cas. (CCH) at 69,707. Also, the degree of participation in business affairs is probative of knowledge. *International Diamond,* 1983–2 Trade Cas. (CCH) at 69,-707–08.

■ In analyzing the facts of this case under this standard, the magistrate noted that behind the power to hold individuals liable for corporate actions is a belief that "one may not enjoy the benefits of fraudulent activity and then insulate one's self from liability by contending that one did not participate directly in the fraudulent practices." *FTC v. Amy Travel,* No. 87 C 6776, slip op. at 32 (N.D.Ill. Feb. 10, 1987). With this policy in mind, the magistrate determined that the FTC had met its burden. The magistrate found that

> [a]lthough it appears that McCann and Weiland themselves did not make sales calls to consumers, the level of admitted participation by McCann and Weiland in the business more than adequately supports a finding that these individuals had knowledge of the practices at issue. McCann and Weiland designed and on a day-to-day basis oversaw the sales operation with the clear purpose of inducing consumer purchases of their vacation passports. Having written the deceptive scripts, McCann and Weiland certainly knew of the material misrepresentations and omissions upon which the scripts were based. They were aware of the high volume of customer complaints and the excessive chargebacks which resulted from the use of the scripts and from the embellishing misrepresentations employed by the telemarketers in deviation from the scripts. Second, by their own admissions, as principal shareholders and officers of the closely held defendant corporations, McCann and Weiland admittedly had authority to control the deceptive sales operation and all other aspects of their business.

*FTC v. Amy Travel,* No. 87 C 6776, slip op. at 32.

These factual findings made by the trial court must be analyzed under the clearly erroneous standard. Fed.R.Civ.P. 52(a). *See In re Muller,* 851 F.2d 916, 920 (7th Cir.1988) ("Only if we are 'left with the definite and firm conviction that a mistake has been committed,' may we disturb the court's findings.") (citing *Anderson v. Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). It is clear that McCann and Weiland were the ones behind the vacation passport scheme. They were the principal shareholders and officers of the corporations. They created the businesses, opened new ones, wrote telemarketing scripts, and hired personnel. They controlled the financial affairs of the companies and reviewed the sales reports and other information. McCann oversaw the daily sales operation and consulted with Weiland regularly. As authors of the sales scripts, they were certainly aware of the misrepresentations contained in them. If they were unable to see trouble coming by looking at the scripts, it is unlikely they

missed the signals sent by the high volume of consumer complaints and the excessive credit card chargebacks.

Defendants offer another defense to this conclusion. They contend that, contrary to appearances, they did not intend to create a fraudulent scheme and they offered evidence to show that they took pains to avoid tangling with the law. The magistrate took note of some efforts by defendants to discourage deviations from approved scripts and clear up problems with credit card charges, but found they were grossly inadequate and did little to stem the tide of consumer dissatisfaction. The defendants offered other justifications for their actions. For instance, Weiland claimed that salespeople withheld the actual price of the vacation package from consumers because the future price of the airline ticket was unavailable at the time of sale. The magistrate discounted this claim, stating that it would have been easy to give the customer a reasonable estimate of the cost and concluding that the salespeople withheld the actual price to raise consumer expectations about the value of the vacation passport. The magistrate found that whatever efforts Weiland and McCann claim to have made were ineffective as shown by the high volume of consumer complaints and credit card chargebacks.

 Defendants strongly argue that their efforts to gain approval from counsel for their activities demonstrate they did not have the necessary knowledge that they were engaging in deceptive practices. Defendants had attorneys review their script and office policies to make certain they were within the boundaries of the law.[8] The magistrate correctly found that the blessing of an attorney did not make the telemarketing scripts truthful. Obtaining the advice of counsel did not change the fact that the business was engaged in deceptive practices. The magistrate was satisfied that the FTC had proven that defendants had sufficient knowledge to find them individually liable. The court determined that reliance on advice of counsel was not a valid defense on the question of knowledge; counsel could not sanction something that the defendants should have known was wrong. The defendants wrote or reviewed many of the scripts that were found to be deceptive and they were undoubtedly aware of the avalanche of consumer complaints. The trial court's conclusion that McCann and Weiland had the necessary knowledge and control to be held individually liable was not clearly erroneous.[9]

## D. The Freeze on Assets

Defendants now contend that the freeze on assets by the TRO and the subsequent permanent injunction prevented them from paying attorneys' fees. They argue that such a freeze violates defendants' constitutional rights by restricting their choices in obtaining representation. *See United States v. Moya–Gomez*, 860 F.2d 706 (7th Cir.1988); *see also Caplin & Drysdale v. United States*, 837 F.2d 637 (4th Cir.) (en banc), *cert. granted,* —— U.S. ——, 109 S.Ct. 363, 102 L.Ed.2d 352 (1988); *but see United States v. Monsanto*, 852 F.2d 1400 (2d Cir.), *cert. granted,* —— U.S. ——, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988). While the issue of whether an asset freeze violates constitutional rights to counsel or due process is interesting, it is unnecessary for this court to reach the question. The trial court modified the asset freeze to allow for reasonable attorneys' fees and expenses. Counsel received between $50,000 and $70,-

---

8. Defendants claim the trial court excluded important evidence relating to advice of counsel. An examination of the record and the trial court's opinion shows that the magistrate was sufficiently aware of defendants' efforts to get counsel's approval of corporate practices. The magistrate's exclusion of certain testimony relating to advice of counsel on the basis of relevancy was not clearly erroneous. *Charles v. Daley*, 749 F.2d 452, 463 (7th Cir.1984).

9. At oral argument, defendants raised a new issue concerning the assessment of individual liability. Defendants argued that it was inappropriate to impose the entire amount of restitution on the individual defendants. The basis for this argument was unclear since it was not raised by the parties in the briefs. We find no merit in this argument and affirm the decision of the trial court to assess all defendants for the full amount of restitution.

000 for his time and effort.[10] The defendants have given us insufficient reason to alter the amount of fees awarded. The magistrate was in the best position to determine what constituted a reasonable fee in this case and we will not disturb her decision. *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031–32 (7th Cir.1988).

**E. Admission of Consumer Affidavits**

█ Defendants dispute the trial court's decision to admit a number of consumer affidavits. On a motion *in limine*, the FTC introduced a number of affidavits from consumers who purchased travel vouchers from the defendants.[11] The affidavits were admitted to show actual consumer harm had resulted from the defendants' activities. The trial court ruled that the affidavits fell within the residual exception to the hearsay rule. Fed.R.Evid. 803(24).[12]

█ In determining the correctness of the trial court's admission of evidence under the residual exception, we must give the trial court "a considerable measure of discretion." *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979). Hearsay offered under Rule 803(24) must satisfy five criteria to be admissible: the statement must be sufficiently trustworthy, material, probative, in the interests of justice, and given to opposing parties with the proper notice. *Id.* at 292–95. Turning to these requirements, it is clear that these affidavits will fall within the residual ex-

ception and the trial court did not abuse its discretion by admitting them. The affidavits possess sufficient guarantees of trustworthiness; each was made under oath subject to perjury penalties and the affiants describe facts about which they have personal knowledge—their contacts with defendants. The evidence is important to the issue of whether there was actual consumer injury from defendant's action and the affidavits would be probative of that fact. The interests of justice are served by allowing the affiants to submit affidavits instead of requiring their appearance in court. The defendants ran a nation-wide telemarketing operation and it would be cumbersome and unnecessarily expensive to bring all the consumers in for live testimony. *See Kitco*, 612 F.Supp. at 1294 (too expensive and time consuming to get witnesses from all over country; affidavits serve interests of justice). Defendants were also given proper notice of the affidavits—they even had the chance to question the affiants themselves, but they chose not to avail themselves of the opportunities. The trial court's decision to admit these affidavits was not an abuse of discretion.[13] However, even if this evidence did not fall within the residual exception, we would also find that the admission of this evidence was not prejudicial to the defendants. Other evidence in the record adequately established that there was actual harm to consumers. The evidence presented in the affidavits was cumulative and had

---

**10.** The actual amount of attorneys' fees awarded cannot be specified since the orders awarding the fees were entered under seal. Counsel for defendants did state at oral argument that the amount was closer to $70,000 than to $50,000.

**11.** Defendants also contest the admission of a large number of consumer complaint letters. These letters were admitted for the limited purpose of showing that defendants were on notice of potential problems with their operations. The letters were not admitted for the truth of their statements and they pose no hearsay problems. Fed.R.Evid. 404(b).

**12.** The FTC claims a separate ground for admitting the affidavits. Apparently, the FTC had made a request to defendants for admissions in the subject matter of the affidavits. In the opinion of the trial court, defendants responded

improperly to the request. The trial court directed defense counsel to reevaluate the response to the requests for admission. Defense counsel did not review his responses and the court then admitted all matters that the FTC had requested, including the contested affidavits. The admission of these affidavits cannot be sustained upon that ground alone. The affidavits must fall within a hearsay exception to be admitted properly.

**13.** Defendants also claimed that the trial court exhibited sufficient bias and prejudice to require reversal. We find no merit to this argument. Friction between court and counsel does not constitute bias. *Hamm v. Board of Regents*, 708 F.2d 647, 651 (11th Cir.1983).

little effect on the determination of actual harm.

### III. CONCLUSION

For the forgoing reasons, the decision of the trial court is AFFIRMED.

### ON DISMISSAL OF APPEAL

On March 21, 1989, we issued an Order directing the parties to submit Memoranda of Law on the issue of whether attorney Robert S. Bennett's appeal of Rule 11 sanctions should be dismissed. Sanctions under Rule 11 were entered against defendants' counsel Bennett in the amount of $1,000 by the Magistrate in this case. The notice of appeal filed July 11, 1988 states: "Notice is hereby given that the Defendants, Amy Travel Service, Inc.; Resort Performance, Inc.; Resort Telemarketing, Inc.; Thomas P. McCann, II; and James F. Weiland, hereby appeal...." Federal Rule of Appellate Procedure 3(c) requires that "the notice of appeal shall specify the party or parties taking the appeal...." The notice filed in this case names the defendants, not Bennett, as the parties taking the appeal.[1]

Our decision in *Rogers v. National Union Fire Ins. Co.*, 864 F.2d 557 (7th Cir.1988), establishes that the attorney is the real party in interest when sanctioned by the district court. *Rogers*, 864 F.2d at 559–60. The Supreme Court has held that failing to name a party in the notice of appeal "constitutes a failure of that party to appeal." *Torres v. Oakland Scavenger Co.*, —— U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). In *Rogers*, we held that in a Rule 11 sanctions appeal, "the attorneys must appeal in their own names. A notice of appeal naming the party ... as the appellant, not the attorneys, does not create jurisdiction over the attorneys' appeal." *Rogers*, 864 F.2d at 560 (citing *Hayes v. Sony Corp. of America*, 847 F.2d 412, 420 (7th Cir.1988)).

Bennett argues that this court should exercise discretion and disregard the omission of his name from the notice of appeal. Bennett claims that our decision in *Hays v. Sony Corp. of America*, 847 F.2d 412 (7th Cir.1988), stands for the proposition that the object of the notice of appeal is merely to give opposing parties notice that an appeal has been taken. Bennett states that all parties were aware of the appeal and who the parties in interest were. Bennett argues that no purpose would be served by dismissing his appeal for what amounts to a harmless error.

Bennett's reliance on *Hays* is mistaken in light of the Supreme Court's decision in *Torres*, 108 S.Ct. 2405 (1988). In *Torres*, the Supreme Court healed a split in the circuits by enunciating an unyielding interpretation of Federal Rule of Appellate Procedure 3(c) that took away this court's discretion to waive technical requirements. Bennett is correct that before *Torres*, "failure to name each appellant forfeited that party's right to appeal only if there was a danger that the appellee might have been misled by the omission ..." *Allen Archery, Inc. v. Precision Shooting Equip., Inc.*, 857 F.2d 1176, 1176 (7th Cir.1988) (citing *Hayes*, 847 F.2d at 414). However, "*Torres* changed the law in this circuit. It requires us to insist on punctilious, literal, and exact compliance ..." with Rule 3(c)'s naming requirements. *Allen Archery*, 857 F.2d at 1177.

*Torres* made the requirements of Rule 3(c) inflexible. The *Rogers* case makes it clear that because the notice of appeal did not name Bennett as the party taking the appeal, we have no jurisdiction over this appeal.

APPEAL DISMISSED.

---

**1.** A separate Notice of Appeal was filed on May 25, 1988, giving notice that the defendants were appealing the district court's decision in *FTC v. Amy Travel*, No. 87 C 6776, slip op. at 27 (N.D. Ill. Feb. 10, 1987). That appeal, No. 88–1997, dealt with the merits of the case and does not concern the Rule 11 issue. Although this appeal, No. 88–2328, and the merits appeal, No. 88–1997, were consolidated for purposes of oral argument, they will be decided separately by this court.