# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2721

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee*,

v.

WORLD MEDIA BROKERS, also
known as 913062 ONTARIO INC.,
624654 ONTARIO LTD., doing business
as EXPRESS MARKETING SERVICES, EXPRESS
MARKETING, doing business as EMS, et al.,

*Defendants-Appellants.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 6985—**Amy J. St. Eve**, *Judge*.

———————

ARGUED FEBRUARY 9, 2005—DECIDED JULY 27, 2005

———————

Before BAUER, EASTERBROOK, and ROVNER, *Circuit
Judges*.

ROVNER, *Circuit Judge*. Although individuals playing the
lottery rarely strike it rich, those selling lottery tickets
apparently do quite well. Take the case of seven affiliated
Canadian corporations, two United States corporations, and
their six corresponding principal officers, who made mil-

lions selling chances to play in the Canadian lottery. Their enterprise came to a halt, however, after the Federal Trade Commission ("FTC") initiated an action for injunctive and other relief pursuant to sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6101-6108, and the FTC Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.1-9. The FTC alleged that the defendants had engaged in deceptive trade practices by, among other things, failing to notify U.S. consumers that it is illegal to buy and sell foreign lottery tickets. The district court entered a permanent injunction against five of the Canadian corporations and ordered them to pay $19 million in consumer redress. The court also entered judgment holding two of the corporate officers, George Yemec and Anita Rapp, jointly and severally liable. The defendants appeal, arguing primarily that the district court erred by holding Yemec and Rapp liable for the corporations' allegedly deceptive practices.

## I.

In 1999 the FTC began investigating a Canadian telemarketing enterprise selling chances to play the Canadian lottery. The enterprise involved the following string of interrelated corporations: World Media Brokers, Inc., a/k/a 913062 Ontario Inc.; 1165107 Ontario Inc., d/b/a Canadian Catalogue, Canadian Catalogue Services, CCS, and Interwin Marketing; Faby Games Inc., a/k/a 1106759 Ontario Inc., d/b/a Canadian Catalogue Services, and CCS; 624654 Ontario Limited, d/b/a Express Sales, Express Marketing Services, EMS, and First Telegroup Marketing; 637736 Ontario Limited, d/b/a Express Marketing Services and EMS; 537721 Ontario Inc., d/b/a Canadian Express Club; Express Marketing Services Ltd., d/b/a EMS; Cash

and Prizes, Inc.; and Intermarketing Services, Inc. It is difficult if not impossible to separate the actions of the various corporations, which we refer to collectively as "the corporate defendants."

The corporate defendants began operations in the late 1980s. At that time, George Yemec, former publisher of "Whole World Lottery Guide" and "Millions Magazine," started several companies that bought groups of lottery tickets and resold them to U.S. and Canadian consumers. Anita Rapp served as a corporate officer for several of the corporate defendants and also handled various financial matters for them.

The various corporate defendants operated by purchasing lists of names that telemarketers then used to call individuals and offer them chances to play the Canadian lottery. There were multiple variations on the offers extended. The most common offers involved opportunities to buy packages or groupings of tickets in two of Canada's largest lotteries, Lotto 6/49 and Lotto Super 7. Telemarketers promised would-be buyers that "playing by mail in a small group is the best way to play the Canadian government guaranteed lottery." The options to play included packages with combinations of individual and group tickets that could be purchased for anywhere from $77 up to $1,000. Other possibilities included a year-long "subscription" to play Lotto 6/49 and Lotto Super 7 (available for a set fee plus an additional $17.95 "service fee"), or a stake in the lotteries comprised of a combination of seven individual tickets, 700 group tickets, one share in the so-called "7,000 group," and a draw from what was called the "Cash & Prizes Program." Others were given a chance to take advantage of a special "introductory offer" to join the "Jackpot Alert Service," a 900 number where callers entered a pin number and paid $1.99 a minute to get lottery information.

The FTC investigated the corporate defendants' operations for several years. During its investigation, the FTC

gathered declarations from individuals who had partici-pated in the lotteries and also procured tape-recordings of telemarketers' calls. Relying on this evidence, in 2002 the FTC filed actions in Ontario, Canada ("the Canadian proceeding") and the Northern District of Illinois. In the Canadian proceeding the FTC obtained two ex parte orders: an injunction authorizing it to freeze certain corporate assets, and an order allowing it to search the corporate defendants' premises.[1]

Several months later, in October 2002, the FTC filed its complaint in district court, alleging that the corporate defendants and six individual corporate officers violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which pro-hibits unfair or deceptive acts or practices in or affecting commerce, and two provisions of the TSR—16 C.F.R. § 310.3(a)(1)(ii) (requiring telemarketers to disclose mater-ial limitations on any goods or services offered) and § 310.3(a)(4) (forbidding telemarketers from making false or misleading statements to induce purchase of goods or services). Specifically, the FTC alleged that the defendants had misled consumers by representing, among other things, that it was legal for U.S. citizens to play the Canadian lottery. In November the district court entered a stipulated order for a preliminary injunction and an asset freeze against both the individual and corporate defendants.

In August 2003, the FTC moved for partial summary judgment against Yemec, Rapp, and five of the Canadian

---

[1] Just over one year later, in October 2003, the Ontario Superior Court of Justice dissolved the injunction on the basis that the FTC had lacked standing to obtain the injunction, had not fully disclosed certain information, and had failed to establish a strong prima facie case of fraud against the defendants or demonstrate that the defendants were likely to remove assets before judgment. The FTC's appeal of that decision was still pending in Canada at the time this appeal was briefed.

corporate defendants. In March 2004, the district court granted the FTC's motion. The court concluded that it was undisputed that the Canadian corporate defendants used telemarketers to call consumers in the United States and sell group and individual tickets in the Canadian lottery. In these calls, telemarketers failed to inform consumers that selling Canadian lottery tickets to U.S. citizens is illegal. *See* 18 U.S.C. § 1301 (making it a crime to "transmit" a ticket or interest in a lottery in foreign commerce); 18 U.S.C. § 1302 (making it a crime to mail any lottery ticket or instrument representing a ticket or interest in a lottery); 18 U.S.C. § 1953 (making it a crime to send in foreign commerce any instrument designed for use in a numbers, policy, or bolita game). In fact, when consumers questioned the legality of buying tickets in the Canadian lottery, the telemarketers were trained to assure them that it was legal. Thus, concluded the court, the corporate defendants had engaged in deceptive practices forbidden by 15 U.S.C. § 45(a)(1), namely by misleading reasonable consumers into believing that it was legal for them to purchase tickets or interests in the Canadian lottery.

Likewise, the corporate defendants had violated § 310.3(a)(1)(ii) of the TSR by failing to conspicuously (or at all, for that matter) disclose that selling foreign lottery tickets is illegal. The district court found that the Canadian corporate defendants had also violated § 310.3(a)(4) of the TSR by falsely assuring consumers of the legality of their purchases. Finally, the district court concluded that Yemec and Rapp were individually liable for the corporate defendants' deceptive practices because they had authority to control the corporations and knew or should have known that it was illegal to sell Canadian lottery tickets to U.S. citizens.

In June 2004, the district court entered final judgment against Yemec, Rapp, and the five Canadian corporate

defendants.[2] The judgment permanently enjoined Yemec, Rapp, and the corporate defendants from engaging in any telemarketing in the United States and from selling lottery tickets to U.S. residents. The court also ordered Yemec, Rapp, and the corporate defendants to pay $19 million in consumer redress. *See* 15 U.S.C. § 57b(b) (giving court jurisdiction to authorize necessary relief, including consumer redress); 15 U.S.C. § 6105(b) (granting FTC authority to seek the same penalties for violations of the Telemarketing Act as for violations of the FTC Act). Finally, the order enjoined the defendants from selling or disclosing customer lists and required them to provide existing customer lists to the FTC.

## II.

We review the district court's grant of summary judgment de novo, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), construing all facts and drawing all reasonable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although all five Canadian corporate defendants appealed, none of the arguments on appeal relate to the corporate defendants' liability. Instead, the defendants argue only that the district court erred by granting summary judgment against Yemec and Rapp and holding them jointly and severally liable for the $19 million in consumer redress.

To hold an individual liable for a corporation's deceptive practices, the FTC must first prove an underlying corporate violation of section 5 of the FTC Act. *See FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *see also FTC*

---

[2] The remaining corporate and individual defendants have since been dismissed or had default judgments entered against them; thus, the district court's judgment is final and appealable under 28 U.S.C. § 1291.

*v. Freecom Communications, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005). Section 5 prohibits "[u]nfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The FTC may establish corporate liability under section 5 with evidence that a corporation made material representations or omissions likely to mislead a reasonable consumer. *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988).

We agree with the district court that the telemarketers' script would likely mislead a reasonable consumer into believing that it was legal to play the Canadian lottery in the United States. Not only did the telemarketers fail to tell U.S. consumers about laws prohibiting buying and selling lottery tickets in foreign commerce, they were instructed to give the following response to those consumers who said that they had previously heard that playing Canadian lotteries was illegal: "Well that's just not true! We have players from each and every one of the 50 states. What you may have heard about is a U.S. postal regulation that doesn't allow anyone to send tickets through the mail, but we don't do that in this game anyway." It is beyond question that the legality of playing would be material to a consumer's decision to purchase the lottery packages. Accordingly, the corporate defendants engaged in deceptive practices both by omitting information about the legality of their offers and by falsely assuring U.S. consumers that playing the Canadian lottery was legal.

The defendants' failure to inform consumers about prohibitions on playing foreign lotteries also runs afoul of at least two provisions of the TSR. Section 310.3(a)(1)(ii) of the TSR requires telemarketers to fully and clearly disclose any material limitations or restrictions on the goods or services offered for sale. 16 C.F.R. § 310.3(a)(1)(ii). It goes without saying that the legality of the offer itself qualifies as a material restriction subject to disclosure. It is equally

apparent that the telemarketers' assurances about the legality of playing violated § 310.3(a)(4), which forbids "making a false or misleading statement to induce any person to pay for goods or services." *Id.* § 310.3(a)(4); *cf. FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999). Thus, the FTC has established that the five Canadian corporate defendants violated section 5 of the FTC Act and subsections (a)(1)(ii) and (a)(4) of the TSR.

Yemec and Rapp essentially concede corporate wrongdoing, but maintain that their involvement was too inconsequential to warrant individual liability. Upon establishing corporate liability, the FTC is obligated to demonstrate that the individual defendants either participated directly in the deceptive acts or practices or had authority to control them. *Amy Travel*, 875 F.2d at 573; *see also Freecom Communications*, 401 F.3d at 1204; *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). The FTC must also prove that the individual defendants either knew or should have known about the deceptive practices, but it is not required to prove subjective intent to defraud. *Amy Travel*, 875 F.2d at 573-74. Instead, the FTC may fulfill the knowledge requirement with evidence that the individuals had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 574 (citation and internal quotations omitted).

We begin with Yemec, who argues primarily that he cannot be individually liable because he did not "directly or indirectly make false or misleading statements to U.S. consumers or participate in practices designed to induce U.S. consumers to purchase shares or interests in foreign lottery tickets." Yemec's argument misses the mark. Whether he personally made misrepresentations is irrelevant so long as the FTC has shown that he had authority to control the corporations' deceptive practices. *See Freecom*

*Communications*, 401 F.3d at 1204 (fact that defendant "never personally misrepresented the income . . . is beside the point because the law did not require the FTC to make such a showing").

Such authority may be demonstrated by active participation in the corporate affairs, including assuming duties as a corporate officer. *Amy Travel*, 875 F.2d at 573. There is no question that Yemec assumed the duties of a corporate officer. He incorporated and served as the director, president, and secretary of World Media Brokers, Inc. He also served as the director, secretary, and treasurer of 624654 Ontario Ltd., and as the director, president, secretary, and treasurer of both 637736 Ontario Ltd. and 537721 Ontario Inc. Given his status as a corporate officer of multiple corporations, Yemec would be hard-pressed to establish that he lacked authority or control over them. Indeed, Yemec concedes in his brief that he "did have authority and control over the Corporate Defendant-Appellants which he owned and managed."

There is also ample evidence establishing that Yemec knew selling Canadian lottery tickets to U.S. consumers was illegal. For instance, in 1995 the Assistant Attorney General of Oregon wrote Canadian Express Club, warning it that the sale of foreign lottery tickets or pools was a criminal offense. At least two consumers also wrote and asked to be taken off the corporate defendants' mailing lists on the grounds that the foreign lottery business was illegal. Additionally, the United States Postal Service personally named Yemec in 1989 when it ordered several of the corporate defendants to cease and desist sending material relating to lotteries in the mail. Yemec ignores this damning evidence, instead making a vague, blanket pronouncement that he cannot be liable because he "took all necessary steps" to keep telemarketers from making misrepresentations and fired those telemarketers who failed to follow company guidelines. Yemec, however, does not explain *how*

he prevented telemarketers from misleading consumers. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1002 (7th Cir. 2003) (party opposing summary judgment must point to specific facts establishing a genuine issue of material fact for trial).

Indeed, to prevent consumer confusion, Yemec would have had to instruct the telemarketers to call U.S. consumers and offer them opportunities to participate in an illegal lottery. It goes without saying that Yemec never took such action. Moreover, Yemec makes no attempt to explain the scripts, which he approved, directing telemarketers to assure consumers that selling and purchasing foreign lottery tickets is legal. In short, the undisputed evidence establishes that Yemec had the requisite knowledge and control to be individually liable for the corporate defendants' violations of the FTC Act and the TSR. *See FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996).

The same is true for Rapp. She attempts to downplay her role in the corporate defendants' operations, characterizing herself as a "mere telemarketing consultant." This characterization is inconsistent with Rapp's responses in the district court to the FTC's Local Rule 56.1(a) statements. There she admitted that she served as a corporate officer for at least two of the corporate defendants. Specifically, she admitted that she is the director and president of 624654 Ontario Ltd., and that she was the president, secretary, and treasurer of 637736 Ontario Ltd. Rapp also admitted performing a number of tasks that evince active participation in the corporate affairs. For instance, she registered and renewed three different business names for 624654 Ontario Ltd. ("Express Sales," "First Telemedia Group," "First Telegroup Marketing"), and also registered and cancelled the name "Express Marketing Services" for it. She is also an authorized signing officer for 637736 Ontario Ltd. Finally, the record contains multiple letters sent by Rapp to banks handling the corporate defendants' accounts. In those

letters she gives the banks directions on handling different accounts and holds herself out as an "authorized officer" of several of the corporate defendants. This evidence establishes a level of corporate involvement sufficient to demonstrate the requisite authority to control the corporate defendants. *See Publ'g Clearing House*, 104 F.3d at 1170 (authority control shown by defendant's authority to sign documents on company's behalf and role as corporate officer).

Rapp's level of corporate involvement likewise suffices to demonstrate that, at the very least, she should have known about the corporation's deceptive practices. She was handling most of the financial matters for several of the defendants, something she could not have done without knowledge of what the corporations were selling. Since the entire premise of the corporation's business was marketing foreign lottery tickets, Rapp must have known what was going on. She too was personally named in the cease and desist order from the United States Postal Service, and thus had notice that trafficking in foreign lotteries is illegal. Accordingly, the district court did not err by holding Rapp jointly and severally liable with the corporate defendants. *See id.*

One final matter. In her reply brief Rapp argues for the first time that the district court erred by deeming certain facts admitted on account of the defendants' failure to respond to the FTC's request for admissions. *See* Fed. R. Civ. P. 36(a). Rapp, however, has waived the argument because she fails to identify what "admissions" she is referring to, or explain how the alleged error by the district court affected its decision. *See, e.g.*, *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived."). The argument is waived for the additional reason that Rapp raises it for the first time in the reply brief. *See Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004). Waiver aside, we can see no

error in the district court's handling of the FTC's requests for admissions. The district court allowed the defendants to withdraw their admissions, which had become binding owing to their failure to respond in a timely fashion to the FTC's Rule 36 requests for admissions. *See* Fed. R. Civ. P. 36(a) (matters deemed admitted when party fails to respond within 30 days); *McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003) (same). Despite being allowed to withdraw their admissions and being given additional time to respond, the defendants never filed any response to the FTC's Rule 36 requests. Given that, we cannot say that the district court erred by deeming the facts admitted.

### III.

For the foregoing reasons, we AFFIRM the district court's judgment granting partial summary judgment in favor of the FTC, entering a permanent injunction, and holding Yemec and Rapp jointly and severally liable for $19 million in consumer redress.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*