**FEDERAL TRADE COMMISSION,
Plaintiff,**

v.

**Lloyd SHARP, et al., Defendants.**

**No. CV–S–89–870 RDF (RJJ).**

United States District Court,
D. Nevada.

Sept. 10, 1991.

Stephen Gurwitz, F.T.C., Washington, D.C., Ruth Cohen, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff.

Matthew Callister, Las Vegas, Nev., for trustee.

Capers G. Barr, III, Barr, Barr & McIntosh, Charleston, S.C., Robert P. Dickerson, Dickerson, Dickerson, Lieberman & Consul, Las Vegas, Nev., for defendants.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION

PRO, District Judge.

### INTRODUCTION

Plaintiff, Federal Trade Commission seeks summary judgment that Defendants George Anderson, Merlyn Berg, Jack Edwards a/k/a Gale Jackson, Carl Grodin, Steven Bourque a/k/a J.W. Hall, Reese T. Houston, Lloyd Sharp, Gayle Gunn, Roy Bonn, Roger Swayze, White Rock Mining, Inc., Lloyds International, Inc., Houston R & R, Inc., Golden Sands Development, Inc., and Marcel, Edwards, Hall & Associates, violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), by engaging in deceptive acts and practices, and that equitable relief, including a permanent injunction and consumer redress is appropriate under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and Fed.R.Civ.P. 65.

The Honorable Roger D. Foley, Senior United States District Court Judge has referred this motion to the undersigned for consideration.

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331(a), 1337(a) and 1335. Defendants' alleged violations of the FTCA were clearly "in or affecting commerce;" therefore, the FTC has authority under Section 13(b) to bring this action.

For the following reasons, this court concludes that Defendants violated Section 5(a) of the FTCA. The court grants the FTC's Motions for Partial Summary Judgment that the Defendants are jointly and severally liable for consumer redress. Doc. Nos. 284 and 293. Moreover, the court finds that good cause exists to permanently enjoin Defendants from violating the FTCA.[1] Doc. Nos. 284 and 293. Final judgment will be delayed until the amount of equitable monetary relief for which each Defendant is liable is established.

### FACTS

Defendants sold "ore purchase contracts" to three mines, Cinder Mountain, Golden Sands/Claim 72 and White Rock. These contracts purported to convey ore from one of the mines. The Defendants promised to process the ore and recover its gold and silver. The purchasers were to receive the precious metal recovered from the ore they purchased. The Defendants claimed they were selling ore purchase contracts in order to raise enough money to put the mines into full production.

Apparently, Defendants promoted ore purchase contracts for all three mines in

---

1. Some of the parties resubmitted motions concerning matters unrelated to this motion. The court takes this opportunity to clarify their status. General Motors Acceptance Corporation resubmitted its Motion for Order Allowing Entry of Judgment, document number 260, as document number 277. Anthony Sanucci resubmitted his Countermotion to Set Aside the Stipulation and Order Filed on January 7, 1991 or in the Alternative Opposition to Motion Allowing Entry of Judgment, document number 266, as document number 278. Although documents 277 and 278 were not mentioned in this court's Order, (doc. no. 300) which was signed July 22, 1991, that Order disposed of documents 277, 278, and all papers supporting or opposing those motions.

the same way. Defendants used a telemarketing approach that combined oral representations and printed material mailed to prospective purchasers. Defendants also solicited investors through print and cable TV.

The FTC alleges Defendants made the following misrepresentations while promoting the mines. First, Defendants misrepresented the value of the ore in all three mines, and misrepresented that the amount of extractable ore in the mines justified commercial exploitation. For example, the FTC alleges Defendants represented that each ton of ore from the White Rock project contained $400 worth of gold and silver. However, the FTC's expert concluded that each ton of White Rock ore contained only $2 worth of gold and even less silver.

Second, Defendants misrepresented how soon delivery of precious metals would begin. For example, Defendants represented that they would deliver gold, silver or cash to White Rock and Cinder Mountain ore purchasers within one to three years. However, Defendants did not have the legal right to mine those claims,[2] they did not have a proven ore processing method,[3] nor had they constructed ore processing plants.[4]

Third, Defendants misrepresented that a portion of the purchasers' payments would be held in interest bearing trust accounts. The money was supposed to be left in the trust account until precious metals were delivered to the purchaser. The money was to be refunded to the purchasers if they elected to discontinue monthly payments. However, the White Rock trust account contained only one third of the funds it was supposed to contain, and the Golden Sands trust account contained less than ten percent (10%) of the amount the bookkeeper stated was on deposit.

Fourth, Defendants misrepresented that Claim 72/Golden Sands, White Rock and Cinder Mountain ore contracts were low risk investments that could return between one hundred percent (100%) and twenty-six hundred percent (2600%) of the initial investment. The FTC alleges that:

A more speculative investment is difficult to imagine. Defendants did not have "successful" mining projects. Project Manager Houston admitted that he had not demonstrated that White Rock was economically feasible. Similarly, Cinder Mountain was never proved feasible, as whatever evaluation work Houston completed was irrelevant once he decided to move the project to another location because of permitting problems. Defendants' ore did not contain appreciable amounts of recoverable precious metals; defendants were not legally entitled to conduct mining actions on the claims and faced substantial delay in obtaining approval to mine. In addition, defendants lacked the financial capability to construct processing plants; thus defendants could not deliver precious metals in fulfillment of the ore purchase agreements. A purchaser of defendants' ore

---

**2.** Defendants did not have the legal right to mine White Rock or Cinder Mountain, and it would have taken two to three years to obtain such permission. It would have been problematic to meet the permitting requirements for the White Rock claim. Similarly, because of permitting problems, the Cinder Mountain claims would have to have been mined from a different location than shown in the Cinder Mountain brochure.

**3.** "The ore processing method described for the White Rock ore utilized a chlorine leaching method which is highly corrosive and expensive to maintain. This method chosen by defendants is not economically feasible and has not been used in this country since 1910–1911.

"Defendants' method for the recovery of precious metals from their Cinder Mountain ore is unproven. According to the Commission's experts, it is highly unlikely that gold or silver could be extracted from the volcanic cinder material, even if quantities of the precious metals were present in the cinders." Memo. accompanying Doc. No. 283, at 17–18 (citations omitted).

**4.** "Sales material for all three projects explicitly represented that the income from the monthly payments would be sufficient to get the mines fully operational. Moreover, newsletters routinely discussed the ongoing construction of the processing plant. These representations were patently false...." Memo. accompanying Doc. No. 283, at 18 (citations omitted).

contracts was virtually guaranteed to lose his entire investment.

Memo. accompanying Doc. No. 284, at 23 (citations omitted).

## ANALYSIS

■ Section 5(a) of the FTCA prohibits "[m]isrepresentations of material facts made to induce the purchase of goods or services." *F.T.C. v. Kitco of Nevada, Inc.,* 612 F.Supp. 1282, 1291 (D.Minn.1985). Section 13(b) of the FTCA authorizes this court to permanently enjoin defendants from violating the FTCA if "there is some cognizable danger of recurrent violation." 15 U.S.C. § 53(b); *United States v. W.T. Grant,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). An individual defendant can be held jointly and severally liable for consumer redress of injuries caused by FTCA violations if: (1) the individual defendant made the misrepresentation or had authority to control the person who made the misrepresentation; (2) the misrepresentation was the kind usually relied on by reasonably prudent consumers, was widely disseminated and consumers actually purchased the product; (3) the individual defendant possessed the requisite scienter. *Kitco,* 612 F.Supp. at 1292–93.

The FTC has moved for summary judgment that the Defendants are jointly and severally liable for consumer redress.[5] The FTC also requests this court issue a permanent injunction enjoining the Defendants from further violating the FTCA.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the question is whether the evidence, considered with any reasonable inferences drawn from that evidence, establishes a "genuine issue as to any material fact." *United Steel Workers*

*Of America v. Phelps Dodge Corporation,* 865 F.2d 1539, 1540 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

### A. The Responding Defendants

#### 1. *Defendant Hall*

■ In 1986, George Anderson hired Hall to market the Claim 72/Golden Sands mining project. Defendants Berg, Edwards and Hall formed Marcel, Edwards, Hall and Associates (MEHA) to sell Claim 72/Golden Sands ore purchase contracts. MEHA's advertisements said they were a licensed mining and metallurgical consultant. However, MEHA's only license was a Clark County Business License.

In June of 1987, MEHA was hired to market the White Rock project. Hall was also the president of Accrued Financial Services, White Rock's bookkeeper. A December 10, 1987, letter, signed by Hall, stated that ground breaking for the White Rock processing plant was scheduled to begin the following week, and that the project would be mined out five to six months later. Plaint. Ex. 11, at 53. The letter also stated that investors could "realize from 600% to 2600% return in fairly short order." *Id.* at 54.

Around November 22, 1989, Hall told an investor that he now owned the mineral rights to the White Rock claim, he was going to start a new project on the claim, and he thought the new project could be in production within 30–60 days. Ex. 11, at 7. Finally, between 1988 and 1989, Hall withdrew $120,000 from the customer trust account. Ex. 29, at 13–18, 22. Hall knew that some of his Co-Defendants also took money from the trust fund. Ex. 22, at 4–7; Ex. 23, at 3–5, 11–12. Hall claims that he repaid $55,000 of the money he "borrowed" to the trust account.

The FTC alleges that the above uncontroverted facts satisfy the elements necessary to hold Hall liable for damages caused by the Defendants FTCA violations. Hall

---

5. "After the court's order finding liability is entered, plaintiff will submit its calculation of the amount of redress due to consumers from the defendants." Memo. Accompanying Doc. NO. 284, at 4.

does not deny that the first two elements necessary to hold him personally liable are satisfied (he made material misrepresentations that were the type normally relied on by consumers, for the purpose of inducing the purchase of ore contracts, those misrepresentations were widely disseminated and consumers did purchase ore contracts). Rather, Hall claims he cannot be held liable because he did not know his representations were false.

To establish personal liability for an FTC violation The FTC is required to establish the defendants had or should have had knowledge or awareness of the misrepresentations, *Kitco*, 612 F.Supp. at 1292, but that knowledge requirement may be fulfilled by showing that the individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Kitco*, 612 F.Supp. at 1292; *see also [F.T.C. v.] International Diamond*, 1983–2 Trade Cas. (CCH) [65, 725] at 69,707. Also, the degree of participation in business affairs is probative of knowledge. *International Diamond*, 1983–2 Trade Cas. (CCH) at 69,708.

*F.T.C. v. Amy Travel Service, Inc.*, 875 F.2d 564, 574 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989).

■ The extent of a defendant's involvement in a fraudulent scheme is indicative of her knowledge. *Amy Travel*, 875 F.2d at 574; *Kitco*, 612 F.Supp. at 1292. Here, Hall was a principal in, and president of MEHA, the chief broker of the White Rock mines. Hall was deeply involved in the marketing of White Rock for around two and a half years. Thus, there is strong evidence that Hall knew his representations were false. However, evidence of subjective knowledge is not necessary to establish liability; rather, the FTC need

only establish that Hall was recklessly indifferent to the truth of his representations. *Amy Travel*, 875 F.2d at 574; *Kitco*, 612 F.Supp. at 1292. There is compelling evidence that Hall was at least recklessly indifferent to the truth.

Hall began selling White Rock ore contracts sometime around June 19, 1987. In December of 1987, he signed a letter predicting White Rock would be mined out by mid–1988, and investors could receive between 600% and 2600% returns. Mid–1988 came and went, White Rock was not even close to paying out its customers' claims, yet Hall continued to promote White Rock.

Hall counters that while he worked at Golden Sands/Claim 72, Defendants George Anderson and Lloyd Sharp provided all his promotional materials and even his sales pitch. In fact, Hall claims, Anderson even showed him a vial of gold to substantiate the promotional materials. Hall claims it was reasonable for him to rely on Anderson and Sharp because they had a lot of experience in the mining business, while he was new to the mining industry.

As to White Rock, Hall asserts that even after forming MEHA to sell White Rock, Sharp and Anderson still supplied all the promotional materials, continually represented to Hall that White Rock was a thriving business, told Hall that a lot of money was being spent on the operation and that Sharp disseminated the newsletters describing White Rock's success.

The FTC responds that Hall cannot now argue that he reasonably relied on his Co-Defendants because of his relative inexperience in the mining business, since he held MEHA out as a licensed "mining and metallurgical consultant.... having extensive knowledge, resources and experience in both mining and investment fields." Ex. 11, at 13. This court agrees with the FTC that these types of contradictory assertions seriously undermine Hall's credibility.[6]

6. Concerning the FTC's allegations that as head of Accrued Financial Services, Hall knew investors' funds were not being spent on the White Rock project, Hall claims he did not direct the bank accounts, he did not know how the money

he disbursed to Lloyd Sharp was being spent and that Sharp told him that a lot of money was being spent on White Rock, Golden Sands and on other projects.

Further undermining the believability of Hall's claim that he relied on Sharp and Anderson is his admission that:

Lloyd Sharp produced newsletters dealing with the mining projects. In a short time these newsletters became increasingly void of detail and progress began to dwindle. At about the same time the State agencies, the SEC, the FBI made it obvious that they were probing into the White Rock Project. Requests for information from various agencies were initiated on a regular basis.

Ex. 21, at 4. Thus, it appears that almost from the inception of the operation, Hall had reason to doubt the veracity of his representations.

■ Hall attempts to account for his continued faith in the integrity of his promotional activities by claiming that "any doubts [he] may have had were dismissed when he consulted with his probation officer who had mining experience. After reviewing the newsletters the probation officer suspected no illegal conduct surrounding the project." Doc. No. 24, at 2. However, if Hall actually knew there was a problem or was recklessly indifferent to a problem, then his reliance on his probation officer is no defense. *F.T.C. v. Amy Travel Service, Inc.*, 875 F.2d 564, 575 (7th Cir.1989) ("reliance on the advice of counsel was not a valid defense on the question of knowledge; counsel could not sanction something that the defendants should have known was wrong")

Finally, Hall maintains that as soon as he suspected Sharp and Anderson of wrongdoing, he separated himself from the old White Rock project and started a new White Rock project. Hall claims that although the new White Rock project had no access to investors' money, in a "good faith effort," he contacted the investors of the old White Rock project and informed them that the new White Rock project would honor their contracts.

The FTC points out that even after Hall formed the new White Rock, he continued to urge customers to make their monthly payments and, in connection with that attempt, he misrepresented the balance of the White Rock buyers' trust account, and he misrepresented that Golden Sands was mining precious metals. Hall does not deny that he made these misrepresentations. Nor does Hall deny that in November 1989, he told investors that he thought he would get the White Rock mine in production in 30–60 days.

Hall's only defense to these last allegations is that:

As was noted in Defendant's Response and again repeated and not denied by Plaintiff in its reply, Mr. Hall separated himself from defendants Anderson and Sharp once he began to suspect any wrongdoing. However, Plaintiff has again answered to representations made by Mr. Hall in connection with the White Rock Project *after* said separation. Mr. Hall again emphasizes, as he did in his Response, that all representations made by him after he established the New White Rock Project were in with knowledge by the FTC and the Receiver Matthew Callister. Furthermore, Mr. Hall has fully cooperated with the FTC and Mr. Callister in all other aspects of their

---

The FTC responds that although Hall now claims that he did not know money from White Rock purchasers was being dissipated, Hall has testified that he knew mining money was spent on Defendants' personal lives. On February 6, 1991, Hall testified "[t]he mining moneys were not spent for mining.... They were spent for things like mobile homes for ex-wives, new automobiles for ex-wives, and supporting sons' and girlfriends' drug habits.... I disbursed $800,000, and for it, all I could see that I got was a $10,000 water well that never got paid for in full." Ex. 22, at 4–5. Moreover, the FTC claims that because Hall was a signatory on the account, he shared control over the account.

However, this court concludes that these facts alone do not necessarily support the FTC's motions.

Although the timing is less than clear, it appears from the context of the above quoted statement that Hall may not have discovered his Co–Defendants' dissipation of assets until November of 1989. *See* Ex. 22, at 4–5. Thus, the above quoted statement does not establish that his representations prior to November 1989, were knowing misrepresentations. Similarly, the fact he was a signatory on the account does not prove he knew how the money from the account was spent.

investigations regarding the mining projects. Also, Mr. Hall made his best efforts to notify investors of the old White Rock default and his intentions to honor their contracts with White Rock and allow investors to amend their contracts.

Doc. No. 294, at 3–4 (citations omitted).

Hall's response is no defense. The FTC's evidence of Hall's representations concerning the "New White Rock" establishes a prima facie case of Hall's liability. Yet, Hall does not deny that his actions satisfy these elements.[7] Accordingly, Hall is jointly and severally liable for redressing consumer injuries caused by the Defendants' FTCA violations.

## 2. *Defendant Edwards*

■ In 1986, Edwards began selling 72/Golden Sands ore contracts. Edwards then helped form MEHA. Edwards later formed Jack Edwards & Associates (JEA), which sold White Rock and Cinder Mountain ore contracts to the public.

The FTC alleges that:

Edwards represented to a White Rock ore purchaser that assay tests of the minesite were showing an average yield of 1½ oz. of gold per ton. (Ex. 17, p. 2) He told another purchaser that the ore processing plant would be ready in the fall of 1988 and that White Rock had approval from the regulatory agencies to mine. (Ex. 14, p. 2) Edwards also represented to a consumer that both Cinder Mountain and Golden Sands were currently paying off investors, when in fact, neither project ever paid off any purchaser. (Ex. 17, p. 2).

Memo. accompanying Doc. No. 284, at 40.

Like Hall, Edwards does not deny that he made material misrepresentations to induce customers to buy ore contracts, that these misrepresentations were widely disseminated and that customers actually bought the ore contracts. However, like Hall, Edwards claims he did not knowingly misrepresent anything.

■ At his deposition, Edwards invoked his fifth amendment privilege against self incrimination and refused to answer questions concerning his knowledge of misrepresentations. The FTC argues that because Edwards deprived it of the chance to investigate the extent of his knowledge during his deposition, he should not be allowed to testify about his knowledge now.

The Federal Rules contemplate that there be "full and equal discovery in advance of trial" so as to prevent surprise, prejudice and perjury. "It is an effective means of detecting and exposing false, fraudulent, and sham claims and defenses." The court would not tolerate nor indulge a practice whereby a defendant by asserting the privilege against self-incrimination during pre-trial examination and then voluntarily waiving the privilege at the main trial surprised or prejudiced the opposing party.

*Duffy v. Currier,* 291 F.Supp. 810, 815 (D.Minn.1968). The FTC claims it has been prejudiced by "defendant's strategic use of a privilege." This court disagrees.

Edwards's use of the privilege does not appear to have been "strategic." His deposition was taken on May 18, 1990. At that time he was either under Indictment, or Indictment was imminent. That Indictment was dismissed on January 10, 1991, for lack of evidence. Thus, it is not surprising that Edwards does not feel the same compulsion to assert his fifth amendment privilege at this time. Such a use of the privilege does not appear to be "strategic."

Similarly, it does not appear that the FTC has been unfairly prejudiced by Edwards's assertion of his fifth amendment privilege. The FTC has been able to thoroughly prepare its motion, despite Ed-

---

**7.** Hall's only other response is that the allegations concerning the new White Rock should be considered separate from the old White Rock. Presumably, Hall is arguing that even if he is found liable for his actions concerning the new White Rock, he should not be held liable for damage caused by the old White Rock. Because this court concludes that Hall was at least recklessly indifferent to his representations about the new and the old White Rock it does not matter whether the new and old White Rock are considered separately.

wards's assertion of the privilege, because Edwards is not the only, or even the primary source of pertinent information. Because Edwards has not used the privilege for purely tactical reasons and the FTC has been able to obtain pertinent information elsewhere, the court will consider Edwards's affidavit testimony. *See Kitco*, 612 F.Supp. at 1290–91.[8]

The FTC then argues that even if the court considers Edwards's affidavit, there are still no material question of fact. Edwards claims all his representations concerning the White Rock and Golden Sands mines were taken from newsletters and brochures that he had no reason to disbelieve. However, Edwards was the principal of JEA which held itself out as a mining consultant. Thus, "[i]t is absurd for him to attempt to minimize his role to that of a mere mouthpiece, repeating misrepresentations to the public without any culpability." Doc. No. 297, at 9.

The FTC also claims Edwards told a potential customer that both the Golden Sands and Cinder Mountain were paying off investors. The FTC claims that not only was this statement false, but there is strong evidence that Edwards knew it was false. First, although he claims to have relied on promotional material supplied by others in making his misrepresentations, no promotional materials support this representation. Second, because Edwards owned Golden Sands ore contracts and knew he had not been paid, he must have known the representation was false.

Juxtaposed against the FTC's evidence is Edwards's claim that he did not intentionally misrepresent any facts. This claim is seriously undermined by the FTC's evidence. Moreover, the degree of a defendant's participation in a fraudulent scheme is probative of knowledge. *Amy Travel*, 875 F.2d at 574; *Kitco*, 612 F.Supp. at 1292. The fact that Edwards began selling these ore contracts in the summer of 1986 and was a principal of two separate "min-

ing consultants" that sold these ore contracts supports an inference of his knowledge.

Finally, even if the FTC's evidence does not conclusively establish Edwards's knowledge, the FTC does not have to establish actual knowledge. Proof of a reckless indifference to the truth is enough. *Amy Travel*, 875 F.2d at 574; *Kitco*, 612 F.Supp. at 1292. Since Edwards was a principal of two companies that were supposedly mining experts, was involved with selling ore contracts for three years and for much of that time was exposed to inconsistent progress reports, it is fair to say that he was at least recklessly indifferent to the truth or falsity of his misrepresentations. Accordingly, Edwards is jointly and severally liable for redressing consumer injuries caused by the Defendants' FTCA violations.

**B. The Defaulting and Non–Responding Defendants**

Default Judgments have been entered against Defendants Lloyd Sharp, Gayle Gunn, Roy Bonn, Roger Swayze, Golden Sands Development, Inc., and Marcel, Edwards, Hall & Associates. "As a general rule, a default judgment establishes, as a matter of law, that defendants are liable to plaintiff as to each cause of action alleged in the complaint." *U.S. v. DiMucci*, 879 F.2d 1488, 1497 (7th Cir.1989). Thus, the defaults entered against these Defendants established that they violated the FTCA, and are, therefore, jointly and severally liable for consumer redress.

Defendants George Anderson, Merlyn Berg, Carl Grodin, Reese T. Houston, White Rock Mining, Inc., Lloyds International, Inc. and Houston R & R, Inc. (as well as the defaulting Defendants) have not responded to the FTC's Motion for Partial Summary Judgment. Under the Local Rule of Practice for the District of Nevada 140–6, "[t]he failure of an opposing party to file a memorandum of points and authorities in opposition to any motion shall constitute a consent to the granting of the

---

**8.** The FTC's motion to strike Edward's affidavit, because it does not comply with local rules, is also denied. Doc. No. 297. However, because

this court is granting partial summary judgment against Edwards, this matter is obviously moot.

motion." Thus, all of the above Defendants are jointly and severally liable for redressing consumer injuries caused by their FTCA violations.

## C. Permanent Injunction

■ Section 13(b) of the FTCA authorizes this court to permanently enjoin defendants from violating the FTCA if "there is some cognizable danger of recurrent violation." 15 U.S.C. § 53(b); *United States v. W.T. Grant,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953).

> Past unlawful conduct may be considered in the determination of likelihood of future violations.... In drawing the inference from past violations that future violations may occur, the Court should look at the "'totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." ... [W]hen the violation has been predicated on upon systematic wrongdoing, rather than isolated occurrences, a court should be more willing to enjoin future conduct....

*C.F.T.C. v. Co Petro Marketing,* 502 F.Supp. 806, 818 (C.D.Cal.1980), *aff'd,* 680 F.2d 573 (9th Cir.1981) (quoting *C.F.T.C. v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979)) In this case, the fraud was certainly "systematic," and there is a very real possibility of recurrent violation. Accordingly, a permanent injunction is appropriate.

## ORDERS

### I.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants, Lloyd Sharp; George Anderson; Steven J. Bourque aka J.W. Hall; Roger Swayze; Gayle Gunn; Gale E. Jackson aka Jack Edwards; Reese T. Houston; Merlyn Berg; Houston R & R Corporation aka The Houston Corporation; White Rock Mining, Inc.; Lloyds International, Inc.: Golden Sands Development, Inc.: Marcel, Edwards, Hall & Associates, Inc.; Roy E. Bonn; Carl Grodin and Vern Jensen, their officers, agents, servants, employees, attorneys, directors, salespersons, independent contractors, distributors, corporations, subsidiaries, affiliates, successors, assigns, and all persons or entities in active concert or participation with them, directly or indirectly, in the promotion, sale, or offering for sale of ore purchase contracts, or any other investment offering, are hereby restrained and enjoined from:

(1) Falsely representing in any manner, directly or indirectly, expressly or implicitly, that the ore from their mines contains valuable deposits of precious metals in sufficient quantity and quality to justify commercial exploitation;

(2) Falsely representing in any manner, directly or indirectly, expressly or implicitly, the value of gold and silver in their mining claims;

(3) Falsely representing in any manner, directly or indirectly, expressly or implicitly, that the mine is a successful project;

(4) Falsely representing in any manner, directly or indirectly, expressly or implicitly, the degree of risk in the purchase of their ore purchase contracts, or any other investment offering;

(5) Falsely representing in any manner, directly or indirectly, expressly or implicitly, the potential profit investors may realize by purchasing their ore purchase contracts, or any other investment offering;

(6) Falsely representing in any manner, directly or indirectly, expressly or implicitly, that they are constructing processing plants or pilot test plants;

(7) Falsely representing in any manner, directly or indirectly, expressly or implicitly, that they will deliver, or will be able to deliver, refined precious metals to ore purchasers within one to three years from the purchase date;

(8) Falsely representing in any manner, directly or indirectly, expressly or implicitly (a) the past or likely future earnings of any customer, or (b) the nature or quality of any service of

defendants in connection with the sale or offering of ore purchase contracts, or any investment offering;

(9) Falsely representing in any manner, directly or indirectly, expressly or implicitly, any other fact likely to affect a consumer's decision to purchase defendants' ore purchase contracts for gold and silver, or any investment offering.

The term "investment offering" as used in this Order refers to any item, good or service, tangible or intangible, which is offered for sale, traded or sold to the public in whole or in part upon any representation, express or implied, that the item, good or service will generate income or that it will appreciate in value.

## II.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants, Lloyd Sharp; George Anderson; Steven J. Bourque aka J.W. Hall; Roger Swayze; Gayle Gunn; Gale E. Jackson aka Jack Edwards; Reese T. Houston; Merlyn Berg; Houston R & R Corporation aka The Houston Corporation; White Rock Mining, Inc.; Lloyds International, Inc.; Golden Sands Development, Inc.; Marcel, Edwards, Hall & Associates, Inc.; Roy E. Bonn; Carl Grodin and Vern Jensen, their officers, agents, servants, employees, attorneys, directors, salespersons, independent contractors, distributors, corporations, subsidiaries, affiliates, successors, assigns, and all persons or entities in active concert or participation with them, directly or indirectly, in the promotion, sale, or offering for sale of ore purchase contracts, shall make the following disclosures in the manner provided as ordered below:

(1) Ore purchase contracts are high risk investments;

(2) Past earnings and past performance of this type of investment do not necessarily reflect future earnings or appreciation. Investments of this type should be considered risky. A customer should not make this investment unless he/she is financially able to accept a significant or total loss of the amount invested;

(3) Mining activities are regulated by a number of state and federal agencies; there may be a delay of several years in obtaining the permits they require before mining may being;

## III.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the statements required to be disclosed as hereinabove ordered, shall be set forth in a clear and conspicuous manner on the first page of the text in all sales brochures and on the front page of all sales or service contracts or agreements with customers, which are disseminated by those persons or entities making the representations; that the disclosure statement shall be at least as large as the capitalized corporation, company, or trade name within the text of the brochure, contract or agreement, but in no event smaller than 10 point type; that such disclosure shall be in 100% black ink against a light background, and boxed; that the copy of the foregoing statement set forth on the front page of each sales or service agreement or contract shall include a signature line for the customer preceded by a declaration that the customer has read and understands the statement; and that no agreement or contract shall be deemed valid or complete unless the customer has signed and dated the required declaration.

## IV.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants, Lloyd Sharp; George Anderson; Steven J. Bourque aka J.W. Hall; Roger Swayze; Gayle Gunn; Gale E. Jackson aka Jack Edwards; Reese T. Houston; Merlyn Berg; Houston R & R Corporation aka The Houston Corporation; White Rock Mining, Inc.; Lloyds International, Inc.: Golden Sands Development, Inc.: Marcel, Edwards, Hall & Associates, Inc.; Roy E. Bonn; Carl Grodin and Vern Jensen, and each of them are liable for equitable monetary relief for the injury resulting from defendants' violations of Section 5 of the Federal Trade Commission Act. The amount of each defendant's liability for

consumer redress shall be set by this Court upon further application by the plaintiff.

## V.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants, Lloyd Sharp; George Anderson; Steven J. Bourque aka J.W. Hall; Roger Swayze; Gayle Gunn; Gale E. Jackson aka Jack Edwards; Reese T. Houston; Merlyn Berg; Houston R & R Corporation aka The Houston Corporation; White Rock Mining, Inc.; Lloyds International, Inc.: Golden Sands Development, Inc.: Marcel, Edwards, Hall & Associates, Inc.; Roy E. Bonn; Carl Grodin and Vern Jensen, in connection with any business entity which they own, direct, or control, directly or indirectly, in whole or in part, and which is engaged in the advertising, offering, promotion, or sale of ore purchase contracts or any other investment offering, shall for a period of five (5) years:

(1) Provide a copy of this Order to any and all persons or business entities that defendant employs or contracts with.

(2) Notify the Commission in writing, within ten (10) days after issuance of this Order, of all such individuals and business organizations described in Paragraph VI (1).

(3) Notify the Federal Trade Commission at least fifteen (15) days prior to any proposed change in any corporation identified in Paragraph VI hereinabove such as dissolution, assignment or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in the corporation that may affect compliance obligations arising out of this Order.

For the purposes of this Order, written notifications to the Commission should be mailed to:

Associate Director for Service Industry Practice

Bureau of Consumer Protection

Federal Trade Commission

Washington, D.C. 20580

## VI.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that each Defendant shall each notify the Commission in writing, within ten (10) days after issuance of this Order, of his current residence and employment status, including the names and business addresses of his current employer, and inform the Commission in writing within thirty (30) days of any changes in his residence address or employment status for a period of five (5) years in order that compliance with the provisions of this Order can be monitored.

## VII.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, for the purpose of further determining or securing compliance with this Order, and subject to any recognized privilege, defendants shall for a period of five (5) years:

(1) Permit duly authorized representatives of the Commission, within five (5) business days of receipt of written notice from the Commission, access during agreed upon hours to their offices and to the offices of any company or any person under their control (who may have counsel present) to inspect and copy all documents of defendants, and all documents of any company owned or controlled directly or indirectly by them, limited to any matters contained in this Order; and

(2) Not interfere with duly authorized representatives of the commission who wish to interview their officers and employees (who may have counsel present) regarding any matter contained in this Order.

(3) Not destroy, mutilate, change, conceal, alter, transfer or otherwise dispose of, in any manner, directly or indirectly, any records or documents relating to the matters contained in this Order. This does not prohibit compliance with legal process, including subpoenas and other legal requests to produce documents, provided that copies of all such documents produced shall be maintained. The provisions of this paragraph shall remain in effect for five (5) years from the date of entry of this Order.

 

(4) Upon written request by any duly authorized representative of the Commission made to defendants, submit written reports under oath, if requested, with respect to any matter contained in this Order.

### VIII.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Court retains jurisdiction of this matter for purposes of construction, modification and enforcement of this Order.

### IX.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff shall, on or before October 4, 1991, file a memorandum setting forth Plaintiff's calculations of monetary compensation for which each Defendant shall be deemed liable.