**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**MINUTEMAN PRESS,**
et al., Defendants.

No. 93–CV–2496 (DRH).

United States District Court,
E.D. New York.

Oct. 5, 1998.

Patricia S. Howard, Paul H. Luehr, John A. Singer, Washington, DC, Ronald L. Waldman, New York City, for plaintiff.

Herz & Ryder, Farmingdale, New York, by Edward B. Ryder, Quadrino & Schwartz, P.C., Garden City, New York, by Richard J. Quadrino, Evan S. Schwartz, for defendants.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

### INTRODUCTION

The Federal Trade Commission ("FTC" or "Commission") commenced the present action to halt alleged deceptive practices in the sale of Minuteman Press International, Inc. ("Minuteman") print shop franchises and Speedy Sign–A–Rama, U.S.A., Inc. ("Speedy") sign-making franchises.

In its complaint, the FTC alleges that defendants violated (1) Section 5(a) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce," and (2) the FTC's Trade Regulation entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" ("Franchise Rule" or the "Rule"), 16 C.F.R. Part 436, by:

a. falsely representing to prospective franchisees that they would achieve specific gross sales levels;

b. falsely representing to prospective franchisees that one-third of their gross sales would be profit;

c. failing to disclose to prospective franchisees, before mid–1991, that defendants imposed on franchisees a substantial transfer/training fee upon the assignment or sale of franchises;

d. making earnings claims concerning gross sales and profit levels to prospective franchisees without having contemporaneous substantiating documentation, and without providing earnings claims documents; and

e. making earnings claims to prospective franchisees in contradiction to the express statement in defendants' general disclosure documents that defendants do not make earnings representations.

The relief sought includes, *inter alia,* issuance of a permanent injunction and redress for consumers allegedly harmed by defendants' activities.

The Court bifurcated the trial. The first phase of the trial addressed defendants' liability and plaintiff's request for injunctive relief. The second phase of the trial will address the amount of redress, if any.

The purpose of this decision is to provide Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure ("Rule") 52, and to direct the entry of a judgment for a permanent injunction pursuant to Rule 58.

## FINDINGS OF FACT

1. *Gross Sales Representations Made by Defendants to Prospective Minuteman and Speedy Franchisees*

The marketing of Minuteman and Speedy franchises during the time frame alleged in the complaint commonly entailed gross sales claims being made by defendants to prospective franchisees. The record is replete with credible evidence compelling that conclusion, including:

a) *The Tucson, Arizona Tape.* On January 9, 1993, an investigator for the Arizona Attorney General, posing as a prospective franchisee at a business opportunity show in Tucson, Arizona, secretly taped a sales presentation made to him by two upper-echelon Minuteman employees, *viz.,* Gary Rockwell and Jeff White. Mr. White provided a narrative overview of Minuteman by citing the monthly sales figures realized by a number of stores, including some "doing well over $150,000 to $200,000 a

month," (Pl.'s Ex. 20 at 9; Pl.'s Ex. 21),[1] with Mr. Rockwell cautioning that "[w]hat is typical or average is about $30,000 monthly gross sales." (Pl.'s Ex. 20 at 12.)

b) *Gross Monthly Minuteman Sales Figures Given to Trial Witnesses.* The sales presentation given by Messrs. White and Rockwell was not an aberration from what typically was said by Minuteman representatives at business opportunity shows and in other sales settings. Among the witnesses called by the Commission who were furnished with specific Minuteman sales information as prospective franchisees were, *inter alia:* (1) William Beasom—"30 thousand dollars in sales for my operation would be no problem," (Tr. at 196); (2) Dale Sekovich, an undercover FTC investigator, acting as a prospective franchisee, was told by two Minuteman executives at a business opportunity show in Anaheim, California that he "could make 30 to 35,000 per month gross [sales] after the first year," (Tr. at 1058–59, 1069); and (3) Jim Karlson—"he said Minuteman stores generally do about $30,000 a month," (Tr. at 1956).

c) *Paravate Testimony Re Speedy Sales Script.* Richard Paravate, a long-term associate of Roy Titus and a former vice president of Speedy, testified about the Corporation's standard sales presentation for business opportunity shows. Indeed, he produced the script. (Pl.'s Ex. 110.) In that highly detailed six page document, which concludes with the comment "Be sure to shake EVERYBODY's hand," the salesperson is instructed to advise prospective franchisees that Speedy opened its "first pilot [company] store in late 1986" in an "average type of town" and "did over $20,000 in sales" in the second month of operation. (*Id.* at unnumbered p. 4.)

Mr. Paravate testified that the script was to be followed exactly. (Tr. at 3010 ("[Y]ou follow it to a T. You don't deviate.").)

---

**1.** The tape of the above referenced conversation is plaintiff's Ex. 24; the transcript of the tape is plaintiff's Ex. 20, and the transcript errata sheet is plaintiff's Ex. 21.

d) *Gross Monthly Speedy Sales Figures Given to Trial Witnesses.* The script for use at business opportunity shows apparently had a counterpart for use in other sales situations, as evidenced by, *inter alia,* the testimony of the following witnesses called by the Commission: (1) Roger Varney—told by Regional Vice President Jay Hanley that "many stores are doing sales up to 20,000 by the end of the year and get off fairly quick," (Tr. at 816); and by defendant Roy Titus—"many stores [are] doing up to $20,000 by the end of the first year," (Tr. at 824); (2) Lois Hamilton—"within a year we should be making $25,000 a month in gross sales," (Tr. at 1670); (3) Robert Storey—"the typical stores were doing twenty to thirty thousand dollars a month in gross sales after two or three months," (Tr. at 574); and (4) Thomas Mohr—"Mr. [Raymond] Titus told me I could expect to do sales of 20 to $25,000 per month, and that I would reach these levels in approximately six to nine months," (Tr. at 6301).

## 2. Profit Representations Made by Defendants to Prospective Minuteman and Speedy Franchisees

In addition to furnishing prospective franchisees with gross monthly sales figures, Minuteman and Speedy often made profitability claims, usually along the following lines: Franchisees could expect that one-third of gross sales would be for fixed costs, one-third would be variable costs, and one-third would be profit. The evidence that such representations were made is formidable, including:

a) *Paravate Testimony Re Speedy Sales Script.* The Speedy script includes:

We were spoiled with the high-profit potential in the printing business. The industry's rule is ⅓, ⅓ and ⅓. In other words, a store doing $30,000 a month in sales should net $10,000 in profits. We don't really adhere to that because we have seen material costs as high as 38% and as low as 22%. We feel that in the sign industry the profit margin is as good, if not a little better than in printing.

(Ex. 110 at unnumbered p. 4.)

b) *Minuteman Profitability Claims Made to Trial Witnesses.* The following witnesses, *inter alia,* were recipients of profitability claims made by Minuteman representatives: (1) Donald Alexander—"[h]e actually put it down on a napkin, wrote it out. One-third, one-third, one-third. And also after four months I should be turning a profit," (Tr. at 2373); (2) Terry Pizzuto—"he again told us that the way it was working is that you will achieve $30,000 in a very short period of time. One-third of what the shop made would be profit," (Tr. at 2473); (3) Pamela Phillips—"[h]e said we could expect about 25 to 30,000 the first year, and at 16,000 we would start making a profit. It would break down to a third, a third, a third," (Tr. at 1568); (4) Jim Karlson—during a visit at Minuteman's home office on Long Island, he was told—in Roy Titus's presence if not by Mr. Titus himself—that "the break out was . . . a third, a third and a third," (Tr. at 1971); and (5) Joseph Paradiso—in describing the frequency with which the one-third, one-third, one-third breakdown was mentioned to him—testified "[i]t was many, many times. It was like the bible. It was thrown out to me over and over. Many times," (Tr. at 373).

c) *Speedy Profitability Claims Made to Trial Witnesses.* The following witnesses, *inter alia,* were recipients of profitability claims made by Speedy representatives: (1) Roy Ashkenaz—he was told that one-third of gross sales would be profit by Regional Vice President Bob Emmett, (Tr. at 1083), and by defendant Roy Titus, (Tr. at 1096); (2) Lois Hamilton—"[m]y husband and I wanted to know from Mark [*i.e.,* Regional Vice President Mark Johnson] what we could expect if we made an investment in the sign company and Mark said that within a year we should be making 25,000 a month in gross sales. And based on that figure, that it would break down to be about a third, that it would break down to be a third materials and

labor costs, a third overhead, and a third profit," (Tr. at 1670); (3) Thomas Pitner—was told at a business opportunity show in Atlanta by Speedy Regional Vice President Bill Lewis "that the stores that were opening up at that time were doing $20,000 worth of volume a month the first month, and he said that you could realize a third, a third, a third in terms of the profits," (Tr. at 3231); and (4) Robert Storey—"[h]e said that they had determined that their sales dollar was broken down by one-third materials and supplies, one-third overhead, and one-third profits," (Tr. at 567).

3. *Conclusions Re Gross Sales and Profitability Claims Made by Defendants to Prospective Minuteman and Speedy Franchisees*

Defendant Roy Titus was the chairperson, chief executive officer and sole shareholder of Minuteman and Speedy. Not surprisingly, then, the evidence establishes that both corporations utilized essentially the same technique in marketing their franchises. That technique typically entailed sales and profitability claims being made to prospective franchisees by regional vice presidents and other upper-echelon personnel including, on occasion, Roy Titus, in an effort to induce interested individuals to become store owners. Notwithstanding defendants' protestations to the contrary, the credible evidence establishes that the practice was pervasive in both corporations during the time frame alleged in the complaint.

4. *Gross Sales Representations Made by Defendants to Prospective Minuteman and Speedy Franchisees Were False*

The FTC has established that the gross monthly sales representations made by de-fendants to prospective franchisees were false. By way of format, the false and inflated nature of the claims *vis a vis* Minuteman will be addressed first, followed by a review of the evidence concerning Speedy's monthly gross sales.

a) *Minuteman.* Defendants proffer that "the parties could fairly agree that the range of monthly gross sales, according to all of the testimony and exhibits, is between $24,000 and $30,000." (Defs.' Post-Trial Br. at 10.) But the "range" of gross sales is largely irrelevant for present purposes. The thrust of the statements targeted by the FTC involves representations as to the gross sales that are *typically* realized by Minuteman franchisees.

In support of its position that the numbers cited by defendants as being "average" or "typical" were, in fact, inflated, plaintiff called Susan Foster, Ph.D., a former economist in the Commission's Bureau of Economics.[2]

Franchisees are required to file monthly royalty statements with Minuteman indicating, *inter alia,* their gross sales for the period covered. Those statements were demanded by plaintiff during the discovery phase of the case. Many of the statements were missing, but those available were produced. Armed with that information, Doctor Foster elected to use the royalty statements for six months of the sixty-six month period, those months being June 1988, August 1989, October 1990, December 1991, February 1992 and April 1993. Her database for those six months—again being what had been received from defendants—represented royalty statements from approximately 55% to 80% of the total number of Minuteman franchises in

---

**2.** In addition, plaintiff called twelve current or former Minuteman franchisees, eleven of whom had average monthly sales below $22,-000; conversely, defendants produced eleven current or former franchisees as witnesses, several of whom had sales figures well in excess of $30,000 per month. However, there is no reason to believe that the success, or lack of success, realized by the franchisee witnesses called by the parties—whether viewed singularly or cumulatively—is representative of the class generally. Accordingly, virtually no weight has been attached to their testimony in determining the accuracy of defendants' monthly gross sales claims.

existence for each of those months. From that information, she determined that the median monthly sales were between $18,000 and $19,500, (Tr. at 2609), and that the average sales level was between $22,000 and $23,000, (Tr. at 2608–09).[3] The significance of the average exceeding the median is that "there are proportionately fewer high performers than there are low performers." (Tr. at 2650.)

Defendants, through cross-examination of Doctor Foster and via the direct examination of their expert, Paul Ainslie, sought to undermine the legitimacy of her conclusions, primarily upon the ground that it is "not based upon a statistical analysis or sample." (Tr. at 5796.) As explained by Mr. Ainslie, statistical reliability presupposes that the data selected from the relevant universe was chosen in a manner "which allows every item within the population, in this case the population would be the six-year period, ... to have an equal opportunity of being selected." (Tr. at 5798.) Her sampling technique, rather than being random, was "nonrandom, and as a result, [Mr. Ainslie opined] you have ... an opportunity for all sorts of bias to enter into the sampling process." (Tr. at 5799.)

Had Doctor Foster been called upon to render an opinion with, for example, a 95% or 99% degree of certainty, defendants' attack on her methodology would be sound. But her task was far less formidable. She was simply asked to determine whether it is more likely than not that defendants' claims of typical or average sales were valid. So viewed, her approach passes muster. Notwithstanding Mr. Ainslie's concern that bias may taint her

findings given the non-utilization of random sampling, the record is devoid of evidence to suggest that such a possibility materialized.

Mr. Ainslie's role was not limited to questioning Doctor Foster's methodology and concomitant results. Rather, he also analyzed the Minuteman royalty statements for April 1993 and opined that the average sales for franchisees in business for one year or more as of that time was $29,313. His conclusion, like those of Doctor Foster, was identified as being the product of "judgmental [rather than random] sampling." (Tr. at 5865.) However, he had more information from defendants regarding monthly sales for April 1993; while her database for that month was 498 royalty statements, his was 673. For that reason, he ascribes greater reliability to his number than hers, although both—in his judgment—are suspect given that neither is based on a "statistical sample." (Tr. at 5854–55.)

More is not necessarily better, and that certainly is true here. Included within the Ainslie's expanded database are royalty statements from 35 franchisees who provided information only after receiving a letter from defendant Haber during the pendency of the present litigation. (Tr. at 2679–80,[4] 5867–69; Pl.'s Ex. 183; Defs.' Ex. R10, Table 5). Their average sales level was $45,701,[5] as compared to $26,217[6] for the other 638 franchises included in Ainslie's database, and caused his determination as to the overall average to increase from the $26,217 figure to $29,313. (Tr. at 5851.)

3. The $22,000 to $23,000 figure is the average for the six year period considered *in toto*. However, based on the first six months of available information for 1993, Doctor Foster found the average monthly gross sales for that period to be $25,607.91. (Pl.'s Ex. 105, Table IV.)

4. Foster testified to 40 such responses; the correct number is 35. (Pl.'s Ex. 183.)

5. Table 5 of Defs.' Ex. R10 indicates the 35 Haber franchisees by using the letter "L" in the first column of the table. The aggregate sales for those franchisees were $1,599,538, for an average of $45,701.

6. When the aggregate sales of the 35 Haber franchisees are subtracted from Mr. Ainslie's database in Table 5 of Defs.' Ex. R10, the average sales level is $26,217 for the remaining 638 franchisees.

Doctor Foster also alluded to an apparent problem with *all* of the additional 175 royalty statements utilized by Mr. Ainslie—both Haber-generated and otherwise—*viz.*, "there are a lot of different locations to choose from, and the ones that have been chosen [by defendants] are systematically the highest performers in ... those locations...." (Tr. at 2682.)

In sum, the methodology used by Doctor Foster was adequate to provide a reliable answer to the question presented. She used a different month for each of the six years, and determined both average and median figures. In contrast, defendants proffered only the average for one month, April 1993, and that figure lacks reliability given the agenda-driven data furnished to Mr. Ainslie by Minuteman.

Plaintiff has established by a preponderance of the credible evidence that the typical gross sales figures given to prospective Minuteman franchisees were false.

b) *Speedy.* Here, as with Minuteman, the parties called various franchisees to the stand presumably to lend support for their respective positions. Accordingly, given the reason underlying their selection as witnesses, none is deemed to be typical. Nonetheless, of the eleven current or former franchisees who testified—six for the FTC, and five for Speedy—only two experienced average monthly sales of $20,000 or more, thus seriously calling into question the typicality of that figure.

More significantly for present purposes, however, was the testimony of Doctor Foster. For the period from 1988 through 1991, she used summaries "provided by the Boston regional office [of the FTC] which [she] understood to be based upon royalty statements that the franchisees had submitted to the franchiser." (Tr. at 2612.) Those summaries, which she had checked by her staff for reliability, (Tr. at 2619), covered California, Florida, New Jersey and New York, (Tr. at 2612). Approximately 50% of the Speedy franchises during that period were located in those

states, which states were chosen to eliminate regional bias. (Tr. at 2624.)

For 1992 and the first six months of 1993, she reviewed all of the franchisee statements furnished by Speedy, which totalled 1115 and 599 respectively. (Pl.'s Ex. 105, Table III; *see also* Tr. at 2632.)

Doctor Foster concluded that average monthly sales for 1988 through 1993 for California, Florida, New Jersey and New York was $11,891, with the corresponding median being $10,000. (Pl.'s Ex. 105, Table I.) The average monthly billings for all states for 1992 was $13,195, with the median being $10,836, and for the first six months of 1993 were $13,845 and $10,939. (*Id.*, Table III.) Significantly, none of the average or median figures approaches the $20,000 sales level which defendants represented to prospective Speedy franchisees as typical. Plaintiff has established the falsity of these representations.

### 5. *Profitability Claims Made by Minuteman and Speedy Were False*

Prospective Minuteman and Speedy franchisees were commonly told that typically one-third of gross sales would be "profit."

The parties dispute the meaning of the word "profit" in the present context. The FTC maintains that it represents what remains after all variable and fixed costs have been paid, but before income taxes. Defendants' view that definition as overly restrictive, and urge that "profit" in a small business sense should be equated with "owner's compensation," *i.e.*, "net profit, plus the base salary of the owners, plus perks to the owner paid by the business." (Defs.' Post–Trial Br. at 17 n. 7.)

Defendants have the better side of the argument. (*See* testimony of FTC witness John Stewart, Tr. at 2155 ("[P]rofit in a small closely held business is almost a meaningless term depending upon where we find the officer['s] or owner's salary being taken out. If in fact up under operating expenses gross officer['s] or owner's

salary [is listed], then net profit would in fact to a large extent be also the owner's compensation.").) Nonetheless, the present record is devoid of evidence to indicate that Minuteman or Speedy franchisees typically realize a profit, in the sense of "owners compensation" or otherwise, that approaches one-third of their gross sales.

In arguing to the contrary, defendants blithely assert that "there is no doubt that one-third in profits has been accomplished by thousands of quick printers in the United States from 1988 through early June 1993." (Defs.' Post–Trial Br. at 17.) That statement, in and of itself, means little because it pertains to all quick printers, thus rendering problematical its relevance re typicality for Minuteman operations. But beyond that, the statement rests on a notion which is simply wrong. Defendants cite studies performed by the National Association of Quick Printers ("NAQP") and, then, in an effort to inflate the owner compensation figures reported therein, argue:

> With regard to the overhead figures, depreciation is listed [by NAQP] as a separate item and, because it is a fictitious expense for tax purposes, it should be eliminated from the calculations. There can be no dispute that a shop owner does not write a check to "depreciation" every month, thereby lowering his checkbook balance.... When adding back in the depreciation figures, the upper quarterlies of profitability for those two years was 36.07% and 34.51%. In performing the same calculation for the third quartile (51–75%) and then averaging all of those figures together, the *entire upper half of all of these shop owners in the United States* averaged 28.43% in owner's compensation.

(Defs.' Post–Trial Br. at 18.)

Defendants' notion that depreciation is a "fictitious expense" is at odds with basic accounting principles. As noted by Mr. Stewart, it "certainly ... is an expense to a business that spends two thousand dollars at the beginning of a year for a computer and that computer is only worth a thousand dollars at the end of the year." (Tr. at 2159.) NAQP's treatment of depreciation is correct.

In sum, "owner's compensation"—minus defendants' proffered creative treatment for depreciation—is an appropriate measure of profits in gauging the legitimacy of defendants' one-third profit representations. The NAQP studies demonstrate that quick printers in the upper quartile may achieve owner's compensation approaching 30% of gross sales. (Tr. at 4501.) The information regarding Speedy is more sketchy, but it will be assumed for present purposes that some companies in its industry may have approached that level during the 1988 to 1993 time period. Yet, such performances may not fairly be labelled as "typical." Indeed, none of the Minuteman or Speedy franchisees who testified for the FTC or defendants at the trial ever experienced legitimately determined "owners compensation" in an amount equating or exceeding one-third of gross sales. (*See* Apps. A and B to Pl.'s Proposed Findings of Fact and Conclusions of Law.)

Plaintiff has proven by a preponderance of the credible evidence that the defendants' earnings claims for Minuteman and Speedy were false.

6. *Defendants Neither Provided, Nor Possessed, Substantiating Documentation at the Time the Sales and Profitability Claims Were Made to Prospective Franchisees*

Given that defendants deny having made the charged sales and profitability claims, it is not surprising that they have presented no evidence to suggest that substantiating documentation was ever furnished to prospective franchisees. However, the evidence that was presented by the FTC indicates that, although such representations were made, supporting documentation was not provided.

Indeed, defendants did not possess such materials during the 1988 to mid–1993 time period. In an effort to remedy that deficiency, defendant Haber sent the form letter, previously noted, seeking to solicit further information from certain franchisees who had neglected to file royalty statements. For the same reason, defendants unsuccessfully sought to have two corporate officers testify about their field-based perceptions regarding the financial performance of existing franchises. (*See* Aug. 18, 1997 Mem. and Order.) Defendant Haber admitted to the lack of sufficient information to permit Minuteman to make any formal earnings claims as late as early 1994. (Tr. at 6002–03.) And finally as to the lack of contemporaneous substantiating documentation for the earnings claims made by defendants, Raymond Titus acknowledged that Minuteman did not collect information from its franchisees regarding profits, (Tr. at 3382), and that the same was true regarding Speedy. (Tr. at 3383 ("It's not something you put in writing. We don't have reports on it.").)

### 7. *Defendants did not Disclose Mandatory Transfer/Training Fees*

This subject was discussed in the Court's opinion of February 4, 1997 which addressed Haber's motion, made pursuant to Rule 52(c), for judgment as a matter of law. In that opinion, it was held that the transfer fee typically charged upon the sale of a franchise was required to be disclosed by defendant corporations under Franchise Rule 436.1(a)(15)(ix),[7] and was not. The relevant portion of that earlier decision, (*see* pp. 9–11), is incorporated by reference and constitutes the Court's findings of fact.

7. Franchise Rule 436.1(a)(15)(ix) directs that prospective franchisees be told "the conditions under which the franchisee may sell or assign all or any interest in the ownership of the franchise, or of the assets of the franchise business."

### 8. *The Defendant Titus Participated in, had the Authority to Control and, in Fact, did Control the Activities of Minuteman and Speedy Regarding the False Sales and Profitability Claims, as Well as the Failures to Disclose the Mandatory Transfer/Training Fee Prior to Mid–1991*

Defendant Roy Titus was the founder and chief executive officer of Minuteman and Speedy until January of 1996, at which time he became the chairperson of the companies and installed his son Robert as the president of Minuteman and his son Raymond as the president of Speedy. (Tr. at 3328–29, 3400.) He was also the sole owner of voting stock of each of the two corporations during the 1988–1993 period. (Tr. at 3334.) Quite simply, Roy Titus ran Minuteman and Speedy. He "oversaw" the training of the regional vice presidents, (Tr. at 3344–46, 3355, 3408), including what could not be said to prospective franchisees during sales presentations,[8] (Tr. at 3349–50, 5369, 5421).

Mr. Titus's involvement was not limited to training, but included attendance at business opportunity shows, (Tr. at 3421, 3376–77), and being kept abreast of what transpired at those shows that he did not attend, (Tr. at 3423). As a result, he testified that he knew what Minuteman's and Speedy's regional sales vice presidents said at franchisees shows. (Tr. at 3423.)

Notwithstanding his awareness of the impropriety of making "earnings claims" to prospective franchisees and his responsibility to address transgressions, (Tr. at 1262), he participated in the charged wrongdoing by making such claims himself, as previously noted.

8. As explained by Mr. Titus: "They [the sales representatives] can't make any earnings claims. They can't make any earnings claims and they can't mention gross figures, even if they're true. They can't mention gross figures. They're told that they çan't." (Tr. at 3349–50.)

With respect to the mandatory nature of the training/transfer fee, he reviewed the Uniform Franchise Offering Circulars ("UFOCs") annually. (Tr. at 3343, 1227–28, 1250.) Based on the totality of the evidence, it is clear that he was cognizant of the transfer/training fee and knew that it should have been included in the UFOCs prior to mid–1991 and that it was not.

9. *Defendant Haber Participated in, and had the Authority to Control the Activities of Minuteman and Speedy Regarding the Mandatory Transfer/Training Fee*

Initially it should be noted that defendant Haber's earlier motion, made pursuant to Rule 52(c), for judgment as a matter of law was granted with respect to the sales and income claims, but denied as to the mandatory transfer/training fee. At that time, the Court concluded that Haber would be jointly and severally liable for the improper collection and inadequate disclosure of the fee should corporate liability ultimately be found, (*see* Feb. 4, 1997 Mem. and Order at 9–12), which has now occurred. Rather than reiterate the relevant findings of fact regarding Haber, that portion of the earlier decision is incorporated by reference.

The foregoing constitutes the Court's Findings of Fact.

## CONCLUSIONS OF LAW

### INTRODUCTION

1. The parties have stipulated that the Court has subject matter jurisdiction and *in personam* jurisdiction over each of the defendants, that venue is properly laid in this district, and that defendants' activities affect "commerce" as that term is used in Section 4 of the FTC Act, 15 U.S.C. § 44.

### Corporate Defendants Have Violated Section 5(a) of the FTC Act

2. Section 5(a) of the FTC Act, 15 U.S.C. Section 45(a)(1), provides that "unfair or deceptive acts or practices in or

affecting commerce are hereby declared unlawful."

■ 3. In order to prove a violation of the Section, the Commission must establish a material representation, omission or practice that is likely to mislead consumers acting reasonably under the circumstances. *See e.g., F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994).

4. The *Pantron* decision delineates two of a number of theories by which the FTC can seek to prove that representations were "likely to mislead" a reasonable consumer: (a) the representations were false or (b) the advertiser lacked a reasonable basis for making the representation. *Id.* at 1096 (citing *Thompson Medical Co.*, 104 F.T.C. 648, 818–19 (1984)).

■ 5. A representation is material if it involves an issue "important to consumers and, hence, likely to affect their choice of . . . a product." *In re Cliffdale Assoc., Inc.*, 103 F.T.C. 110, 165 (1984).

■ 6. Here, the FTC has established by a fair preponderance of the credible evidence that defendants have violated Section 5(a) by:

(a) making false gross sales and profitability claims to prospective Minuteman and Speedy franchisees. Such misrepresentations—which tend to bear directly on the economic viability of the transaction under consideration—are both likely to deceive and material. *See F.T.C. v. Security Rare Coin & Bullion Corp.*, 1989–2 Trade Cas. (CCH) ¶ 68,807, at 62,219 (D.Minn.1989), *aff'd*, 931 F.2d 1312 (8th Cir.1991); *F.T.C. v. Kitco of Nevada, Inc.*, 612 F.Supp. 1280, 1282 (D.Minn.1985); and

(b) as shall be explained in paragraph 7, *infra*, defendants have failed to comply with various provisions of the Franchise Rule, which delinquencies also constitute violations of Section 5(a).

### Corporate Defendants Have Violated the Franchise Rule

7. Title 16 C.F.R. Section 436.1 provides that "it is an unfair or deceptive act

or practice within the meaning of section 5 of [the FTC Act] for any franchisor" to violate a provision of the Franchise Rule. 16 C.F.R. § 436.1 (1998). *See also* 15 U.S.C. § 57a(d)(3).

■ 8. The transfer/training assignment fee which Minuteman and Speedy charged in certain situations should have been disclosed to prospective franchisees and was not prior to mid–1991. This failure is a violation of 16 C.F.R. § 436.1(a)(15)(ix). (*See* Feb. 4, 1997 Mem. and Order at 9–11.)

■ 9. Each corporate defendant filed UFOCs to comply with the disclosure requirements of the FTC Act and Section 436 of 16 C.F.R. In those documents, the franchisor indicated that no earnings claims [9] were being made, and that none of its officers, directors or employees were authorized to make such statements. Nonetheless, as noted previously, such representations were made on a regular basis to prospective franchisees. That conflict, *viz.*, between the disclaimers in the UFOCs and the representations embodied in sales presentations, is violative of the Franchise Rule. 16. C.F.R. § 436.1(f); *Final Interpretive Guides*, 44 Fed.Reg. at 49,971.

■ 10. In any event, having elected to make earnings claims to prospective franchisees, defendants were obligated to have written [10] substantiating documentation on hand, *see* 16 C.F.R. Section 436.1(b)(2), (c)(2), and to furnish supporting "Earnings Claim Document[s]" to those individuals to whom representations

were made. *Final Interpretative Guides*, 44 Fed.Reg. at 49,966, 49,982. Defendants violated both of these requirements.

### *The Individual Defendants are Liable*

■ 11. The standard for determining individual liability is well synopsized in the following excerpt from *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989):

> An individual may be held liable under the FTCA for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. Once corporate liability is established [as has occurred here], the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them. Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. The FTC must then demonstrate that the individual had some knowledge of the practices.

*Id.* at 573 (citations omitted).

■ 12. The Commission's obligation to establish knowledge "may be fulfilled by showing that the individual had 'actual knowledge of the material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the

---

**9.** The Franchise Rule defines earnings claims to include any oral, written, or visual representations to a prospective franchisee which state specific actual or potential levels of sales, income, gross or net profits, or to make representations that state other facts that suggest such specific levels. 16 C.F.R. § 436.1(b), (c), (d); *Final Interpretive Guides*, 44 Fed.Reg. at 49,982.

**10.** Section 436.1(b)(2) (pertaining to potential earnings claims) and Section 436.1(c)(2) (pertaining to past earnings claims) do not contain the word "written." Yet, the require-

ment that substantiation be in that form is implicit, given the directive that a franchisor which makes an earnings claim must have supporting "materials," in its "possession," for review by "any prospective franchisee and ... the Commission ... upon reasonable demand." *See generally Final Interpretive Guides*, 111.B, 44 Fed.Reg. at 49,982 ("[A] franchisor must possess the *data* upon which its earning claim is based at the time the representation is made.") (emphasis supplied).

truth.'" *Id.* at 574 (quoting *Kitco of Nevada, Inc.*, 612 F.Supp. at 1292).

13. As indicated in the Findings of Fact portion of this opinion, each of the defendants, but for Haber, had knowledge of all of the FTC Act and Franchise Rule violations and was directly involved in those acts and omissions. With respect to Haber, his responsibility is confined solely to the failure to disclose the mandatory transfer/training fees.

### Injunctive Relief Necessary to Prevent Further Violations of the FTC Act and Franchise Rule

14. FTC Act Section 13(b), 15 U.S.C. § 53(b), provides that the Commission, in "proper cases," may seek a permanent injunction.

15. The Courts have construed the term "proper cases" to encompass "any violation" of a statute administered by the FTC. *See F.T.C. v. Evans Products Co.*, 775 F.2d 1084, 1086–87 (9th Cir.1985); *F.T.C. v. Virginia Homes Mfg. Corp.*, 509 F.Supp. 51, 54 (D.Md.), *aff'd*, 661 F.2d 920 (4th Cir.1981) (unpublished table decision); *F.T.C. v. Investment Developments, Inc.*, No. Civ.A. 89–642, 1989 WL 62564, at *4 (E.D.La. June 8, 1989). Permanent injunctions have been issued pursuant to Section 13(b) for a wide variety of Section 5 violations, including those pertaining to the marketing of franchises and other business ventures. *See F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir.1982); *F.T.C. v. Kitco of Nevada Inc.*, 612 F.Supp. 1282 (D.Minn.1985).

■ 16. Defendants maintain that injunctive relief is inappropriate absent fraud. The statute, of course, contains no such limitation. Moreover, the purpose of the FTC Act, including Section 13(b), is to protect consumers, not to punish wrongdoers. If erroneous information is being disseminated in the marketplace, the availability of injunctive relief does not turn on whether the person or entity making the false claims is acting fraudulently as distinct from recklessly or due to sheer igno-

rance. The effect on consumers is the same in any event. As a result, the courts have not circumscribed the applicability of Section 13(b) in the manner urged by defendants. Rather, any violation of a "provision of law enforced by the Federal Trade Commission," 15 U.S.C. § 53(b)(1), may serve as a proper predicate for the issuance of an injunction. *See e.g., Evans Products Co.*, 775 F.2d at 1087 ("In attempting to limit [Section] 13(b) to cases involving 'routine fraud' or violations of previously established FTC rules, [the defendant] misreads both the caselaw and the legislative history.' ") (citation omitted); *Virginia Homes Mfg. Corp.*, 509 F.Supp. at 54; *F.T.C. v. Brown & Williamson Tobacco Corp.*, 580 F.Supp. 981, 982, 990 (D.D.C.1983), *aff'd in part and remanded in part*, 778 F.2d 35 (D.C.Cir. 1985) (narrowing scope of injunction).

■ 17. A permanent injunction may properly issue in those situations involving a "cognizable danger of recurrent violation[s]," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *F.T.C. v. Sharp*, 782 F.Supp. 1445, 1449 (D.Nev.1991), or " 'some reasonable likelihood of future violations.' " *F.T.C. v. Magui Publishers, Inc.*, 1991–1 Trade Cas. (CCH) ¶ 69,425, at 65, 727–28, 1991 WL 90895 (C.D.Cal.1991) (citing *C.F.T.C. v. Co Petro Marketing Group, Inc.*, 502 F.Supp. 806, 818 (C.D.Cal.1980), *aff'd*, 680 F.2d 573, 582 n. 16 (9th Cir. 1982)), *aff'd*, 9 F.3d 1551, 1993 WL 430102 (9th Cir.1993) (unpublished table decision).

■ 18. Both parties agree, (*see* Defs.' Br. at 4; Pl.'s Reply at 19), that the factors enunciated in *Magui* should be considered to determine whether there is a cognizable danger of future violations in the present case. Those factors are:

the degree of scienter, whether the conduct was an isolated incident or recurrent, whether defendants' current occupations position them to commit future violations, the degree of harm consumers suffered from defendants' unlawful

conduct, and defendants' recognition of their culpability and the sincerity of their assurances (if any) against future violations.

*Magui*, 1991–1 Trade Cas. (CCH) at 65,-728, 1991 WL 90895.

19. A juxtapositioning of the *Magui* factors against the evidence in the present case demonstrates the need for a permanent injunction. Common to the sales presentations of Minuteman and Speedy were false earnings claims made to prospective franchisees. The claims were made by various regional vice presidents as well as by other corporate officers and employees, including defendant Roy Titus. With the exception of defendant Haber who has moved on to another position with another company, the other defendants remain in a position to commit future violations. The extent and nature of past and prospective consumer injury associated with the established violations is significant. Defendants' recognition of their culpability is non-existent, and there is no reason to believe that the past proscribed practices will cease absent injunctive relief.

20. In sum, the Commission has established the need for a permanent injunction against the corporate defendants, as well as Roy Titus, to prevent a recurrence of the widespread false earnings claims and concomitant Rule violations that are the subject of the present litigation. With respect to the failure to disclose the mandatory training/transfer fee, no injunctive action is necessary since the UFOCs in effect since 1991 fully describe the nature of those fees.

21. In their post-trial brief, defendants requested permission to submit a proposed injunction for the Court's consideration should it be determined that a permanent injunction would issue. Defendants' application is granted, with the due date for such a submission being on or before October 20, 1998.

### Monetary Relief is Appropriate

22. In its complaint, FTC seeks not only injunctive relief but also consumer redress under the Court's equitable powers pursuant to Sections 13(b) and 19(b) of the FTC Act. As noted, the present trial was bifurcated. Accordingly, the question before the Court now is not the nature or amount of consumer redress to be awarded but whether such relief is appropriate under the attendant circumstances.

23. Before discussing Sections 13(b) and 19(b) in greater detail, it should be noted that this issue, *i.e.*, the question of monetary relief, is considerably more problematical than the other issues discussed thus far. Often, defendants facing such assessments are selling a fraudulent product, such as the "Dali" prints in *F.T.C. v. Magui Publishers, Inc., supra,* or blatantly misrepresenting the value of the product being sold, such as the coins in *F.T.C. v. Security Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1314 (8th Cir.1991) ("Security Coin graded the value of its own coins and arbitrarily marked up the price of the coins sold to consumers two or three times the wholesale price."). Here, in contrast, defendants are marketing a basically sound product, albeit frequently in a manner which is violative of the FTC Act and Franchise Rule. Indeed, many franchisees have enjoyed significant success as a result of their ongoing affiliation with defendants. The goal of the second phase of the trial, of course, should be to fashion appropriate redress, but mindful of the desirability of avoiding the economic obliteration of either Minuteman or Speedy. That being said, attention will now be directed to Sections 13(b) and 19(b).

24. *Consumer redress is appropriate under 13(b).* Although the primary purpose of Section 13(b) is to enjoin violations of Section 5 of the FTC Act, it may also be utilized to provide other forms of equitable relief should it be established that defendants have made representations "of a kind usually relied upon by reasonable and prudent persons, that ... were

widely disseminated, and that ... injured consumers actually purchased defendants' products." *Security Rare Coin & Bullion Corp.*, 931 F.2d at 1316 (citing *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir.1989) and *F.T.C. v. Kitco of Nevada Inc.*, 612 F.Supp. 1282, 1293 (D.Minn. 1985)).

■■■ 25. As noted, the earnings misrepresentations here were widely disseminated. Moreover, some consumers were injured by purchasing defendants' products, *i.e.*, by becoming Minuteman or Speedy franchisees, a number of whom testified for FTC at the trial. Attention will now be directed to the remaining prerequisite to the issuance of ancillary equitable relief, to wit, that such misrepresentations were the type upon which a reasonably prudent person would typically rely.

26. Defendants argue that in determining the issue of *reasonable reliance,* the representations may not be viewed in isolation. Rather, all of the information conveyed by the franchisor must be considered. A reasonably prudent person, in defendants' view, would not rely on the claims targeted by the FTC given the disclaimers in the UFOCs, coupled with the franchisee's acknowledgement in the franchise agreement that no such representations had been made by the franchisor.

27. Does this friction between the oral and written representations negate reasonable reliance as a matter of law? In asserting that it does, defendant cites a number of cases including *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 829 (D.Minn.1989); *One–O–One Enters., Inc. v. Caruso*, 668 F.Supp. 693, 699 (D.D.C.1987), *aff'd*, 848 F.2d 1283 (D.C.Cir.1988); *Piantes v. Pepperidge Farm, Inc.*, 1995–1, Trade Cas. (CCH) ¶ 10,627, at 25,506 (D.Mass.1995); and *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir.1988).

28. Each of the above disclaimer cases cited by defendants was a private suit rather than a public enforcement action.

By way of example, the plaintiffs in *Carlock v. Pillsbury Co.* were a group of Haagen–Dazs franchisees who sued the franchisors, manufacturers and distributors of that product. Among the causes of action asserted were those predicated on defendants' alleged fraudulent representations regarding the start-up and operating costs of the stores, as well as the likely income to be generated. In granting defendants' motion to dismiss those claims, the Court first articulated the standard elements of fraud (including a material false representation, knowingly made, upon which the aggrieved party justifiably relied to his or her detriment), *see Carlock,* 719 F.Supp. at 827, and then noted that "[a] party cannot reasonably rely upon alleged fraudulent promises which are directly contradicted by the terms of an applicable offering statement or a subsequently executed contract." *Id.* at 829 (citations omitted).

29. If the present plaintiff were an aggrieved Minuteman or Speedy franchisee instead of the FTC, *Carlock* would be of aid to defendants. But such is not the case. The previously delineated elements of proof when the FTC seeks ancillary relief under Section 13(b) as part of a Section 5 enforcement proceeding are markedly different than in a fraud action between private litigants. Thus, *e.g.,* a conflict between a specific disclaimer and a contrary oral representation—typically fatal to a reasonable reliance argument in a purely private suit—is, as discussed previously, *ipso facto,* actionable by the FTC as violative of Franchise Rule 436.1(f) if the disclaimer is in a UFOC.

30. While a conflict between UFOC disclaimers and an oral representation may be germane to the issue of reliance, it is the "common-sense net impression," *Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir.1989), which controls. Here, a reasonable consumer could legitimately conclude that he or she was being furnished important specific earnings information, *subrosa*, to assist in the deci-

sion-making process notwithstanding the general disclaimers in the UFOC. As Minuteman Regional Vice President Steve Cooper explained to undercover Washington State investigator Mary Beth Haggerty–Shaw as a store owner wrote the one-third profit formula on a scrap of paper: "Listen Mary, this is what you've got to listen to, this is what I can't tell you." (Tr. at 927.) Later, Mr. Cooper's reluctance to directly violate the law—uncommon amongst defendants' sales personnel—was compromised upon his utterance of the one-third formula to Investigator Haggerty–Shaw, although coupled with the caveat that further discussion was not possible given that his "hands [were] tied." (Tr. at 928.) In sum, *Carlock* and like cases do not support defendants' argument that the FTC has failed to prove that the earnings claims made "were of a kind usually relied upon by reasonable and prudent persons." *Security Rare Coin & Bullion Corp.*, 931 F.2d at 1316.

31. The Commission has met its burden of proof as to each of the elements necessary for ancillary relief sought, *viz.*, that the earnings claims were widely disseminated and were of a kind a reasonably prudent person would rely upon, and that injured consumers purchased the product.

32. And finally with respect to Section 13(b), the statute contains no statute of limitations. Judge Wexler, to whom this case was originally assigned, ruled that the Section 19 three year statute of limitations is not applicable to Section 13(b). Defendants asks this Court to revisit that subject given what they perceive to be the short shrift that Judge Wexler devoted to the topic. The Court respectfully declines that invitation, and finds that Judge Wexler's decision represents the law of the case.

33. *Consumer Redress is Appropriate Under 19(b)*. Section 19(b) grants the Court the right to "grant such relief that the Court finds necessary to redress injury to consumers" resulting from a violation of the Franchise Rule. 15 U.S.C. § 57b.

34. The FTC has established that defendants have violated various provisions of the Franchise Rule. Accordingly, the Court is empowered, under Section 19(b), to "grant such relief as the court finds necessary to redress [resulting] injury to consumers." 15 U.S.C. § 57b(b). To the extent more than simply a violation of the Franchise Rule is required to activate the Court's equitable powers under Section 19(b), the FTC has proven more as detailed in the prior portion of this opinion regarding Section 13(b), which is hereby incorporated by reference.

## CONCLUSION

The FTC has established:

(1) that defendants violated both Section 5(a) and various provisions of the Franchise Rule, as alleged in its complaint;

(2) that injunctive relief under Section 13(b) is necessary to prevent a recurrence of the proscribed conduct involved; the defendants, as requested, will have fifteen days after their receipt of this Memorandum and Order to submit a proposed permanent injunction for the Court's consideration;

(3) that each of the elements of proof necessary for the Court to issue ancillary relief under Sections 13(b) and 19(b) is present;

(4) that defendant Titus is jointly and severally liable for any consumer redress that may be ultimately awarded by the Court after the second phase of this bifurcated proceeding is concluded; and

(5) that defendant Haber is jointly and severally liable for any consumer redress that may be ultimately awarded by the Court with respect to the mandatory transfer/training fee charged certain Minuteman and Speedy franchisees.

The above constitutes the Court's Findings of Fact and Conclusions of Law as to the liability phase of the trial.

The parties are directed to contact the magistrate judge assigned to this case, *viz.*, the Hon. Arlene R. Lindsay, on or before November 1, 1998, for the purpose of scheduling a settlement conference with respect to the unresolved redress portion of the proceeding.

SO ORDERED.